UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 13-10111-DJC |
| | ) | |
| 1.    FRANCISCO MONTEIRO, | ) | |
| Defendant | ) | |

GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM

The jury convicted Francisco Monteiro (hereinafter "Monteiro" or the "defendant") of

conspiracy to distribute 100 grams or more of heroin (Count 1s) and of distributing just under

100 grams of heroin on February 15, 2013 (Count 2s). The jury found the defendant guilty of

possession with intent to distribute heroin seized on March 1, 2013 (Count 3s), but did not find

that 100 grams or more was attributable and reasonably foreseeable to the defendant. The jury

convicted the defendant of committing a violent Hobbs Act robbery of the Gonsalves Brothers,

two large-scale Cape Cod oxycodone traffickers (Count 4s), but found him not guilty of using a

firearm during the robbery (Count 5s). As was said often during the defendant's trial and in the

government's initial sentencing memorandum, these offenses are all of a piece – the defendant is

a drug dealer who robs other drug dealers.

Based on the testimony of CW-1 and other evidence introduced at trial, the United States

Probation Office determined that (a) over a kilogram of heroin was attributable and reasonably

foreseeable to the defendant during the life of the conspiracy (CW-1 testified that he had picked

up 50-100 grams of heroin from Monteiro every other week for a year); (b) the defendant was an

organizer or leader within the heroin trafficking conspiracy, for instance, sending a lieutenant

(Manuel Lopes) to accompany CW-1 to purchase 100 grams of heroin while he waited in safety

in CW-1's car; (c) the defendant possessed dangerous weapons – i.e., brass knuckles and a

firearm – during the commission of these offenses; (d) the defendant used, threatened to use, and directed the use of violence during the commission of these offenses; and (e) the defendant engaged in these offenses as part of a pattern of criminal conduct engaged in as a livelihood. See Pre-Sentence Report (PSR), ¶¶ 60-64, 66, 68. With these specific offense characteristics and a criminal history category (CHC) of IV, Probation determined that the defendant's Guideline Sentencing Range (GSR) was 324-405 months. PSR, ¶¶ 81, 144.

At a hearing on August 19, 2015, the Court invited the parties to consider what impact, if any, the jury's verdict should have on determining the defendant's GSR. The Court expressed reservations about concluding that the defendant used a firearm during the robbery and used the gun to commit an act of violence (pistol-whipping Stanley Gonsalves) when the jury returned a not guilty verdict on Count 5s. Similarly, the Court faces a related question concerning the calculation of the drug weight attributable to the defendant, where the jury attributed more than 100 grams of heroin to the defendant during the life of the conspiracy but did not attribute the 127 grams of heroin seized from Lopes' residence on March 1, 2013 to him.

Simply put, the Court does not demonstrate a lack of respect for the jury's verdict when it appropriately determines the applicability of various sentencing factors. Federal law permits a sentencing court to broadly consider a defendant's conduct and background when sentencing him. See 18 U.S.C. § 3661 ("[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"). Section 1B1.3(a)(1) directs the Court, in calculating a Guideline range, to consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in

preparation for that offense, or in the course of attempting to avoid detection or responsibility for

that offense." Under § 1B1.3(a)(2), the Guidelines require that the Court determine the base

offense level by considering "all acts and omissions ... that were part of the same course of

conduct or common scheme or plan as the offense of conviction." USSG § 1B1.3(a)(2).

Section 1B1.3 also instructs a sentencing court to consider all "relevant conduct" in

determining the applicable Guideline range. A sentencing court may consider uncharged

conduct, United States v. Polk, 508 F.Supp.2d 89, 98–99 (D.Me.2007), aff'd, 546 F.3d 74 (1st

Cir.2008); charged but not yet convicted conduct, United States v. Anonymous Defendant, 629

F.3d 68, 76–77 (1st Cir.2010); conduct underlying dismissed counts, United States v. Graciani,

61 F.3d 70, 74 (1st Cir.1995); and acquitted conduct. United States v. Paneto, 661 F.3d 709, 715

(1st Cir.2011). A Court may likewise consider evidence a defendant successfully suppressed,

United States v. Acosta, 303 F.3d 78, 86 (1st Cir.2002); and evidence inadmissible at trial. United

States v. Phaneuf, 91 F.3d 255, 261–62 (1st Cir.1996).

Alleyne v. United States, 133 S.Ct. 2151 (2013) is not to the contrary. In Alleyne, the

Supreme Court found that any fact that triggers a mandatory minimum sentence must be

submitted to and found beyond a reasonable doubt by a jury. Id. at 2162-63. However, the

Supreme Court went to great lengths to point out that there remains a place for "judicial

factfinding" at sentencing, even in the post-Alleyne world. Id. at 2163. The Court noted:

> In holding that facts that increase mandatory minimum sentences must be
> submitted to the jury, we take care to note what our holding does not entail. Our
> ruling today does not mean that any fact that influences judicial discretion must
> be found by a jury. We have long recognized that broad sentencing discretion,
> informed by judicial factfinding, does not violate the Sixth Amendment.

Id., citing Dillon v. United States, 560 U.S. 817, 828-29 (2010) ("Within established limits[,] ...

the exercise of [sentencing] discretion does not contravene the Sixth Amendment even if it is

informed by judge-found facts" (emphasis deleted and internal quotation marks omitted));

Apprendi v. United States, 530 U.S. 466, 481 (2000) ("[N]othing in this history suggests that it is

impermissible for judges to exercise discretion—taking into consideration various factors

relating both to offense and offender—in imposing a judgment *within the range* prescribed by

statute") (emphasis in original); United States v. Tucker, 404 U.S. 443, 446 (1972) (judges may

exercise sentencing discretion through "an inquiry broad in scope, largely unlimited either as to

the kind of information [they] may consider, or the source from which it may come"); Williams

v. New York, 337 U.S. 241, 246 (1949) ("[B]oth before and since the American colonies became

a nation, courts in this country and in England practiced a policy under which a sentencing judge

could exercise a wide discretion in the sources and types of evidence used to assist him in

determining the kind and extent of punishment to be imposed within limits fixed by law").

It remains within the sentencing court's discretion to judicially find facts informing the

sentence actually imposed, provided that any such fact does not trigger a mandatory minimum

punishment or alter a statutory maximum, and that the ultimate sentence remains within the

range of penalties set forth in the statute of conviction. United States v. Doe, 741 F.3d 217, 234

(1st Cir. 2013). In such a situation, Alleyne does not apply, and the sentencing court may

continue to find facts based upon a preponderance of the evidence. Id. Accord United States v.

George, 761 F.3d 42, 60 (1st Cir. 2014) (enhancement did not increase statutory maximum or

minimum sentence so preponderance, not beyond a reasonable doubt, appropriate standard).[1]

---

[1]    Some judges are troubled by the use of acquitted conduct at sentencing. See United States v. St. Hill, 768 F.3d 33 (1st Cir. 2014) (Torruella, concurring); United States v. Alejandro-Montanez, 778 F.3d 352 (1st Cir. 2015) (Torruella, concurring). Nevertheless, the Supreme Court recently reaffirmed the use of acquitted conduct at sentencing. In United States v. Jones, 744 F.3d 1362 (D.C.Cir. 2014), the district court found by a preponderance of evidence that the defendants were part of a conspiracy to distribute over 280 grams of crack cocaine, though the jury convicted them of distribution only and acquitted them of conspiracy. Id. at 1369-70. While

With these principles in mind, it is clear that Probation correctly assessed each of the guideline enhancements noted above. Probation concluded that at least one kilogram of heroin was attributable and reasonably foreseeable to the defendant. CW-1 testified that after the robbery of the Gonsalves Brothers, the oxycodone market dried up and the defendant moved into selling heroin. CW-1 picked up 50 to 100 grams of heroin from the defendant (packaged in different ways, of varying quality, stolen from different drug dealers) for about a year leading up to the defendant's arrest. PSR, ¶ 60. Combined with the 97 grams of heroin sold by the defendant, Lopes, and Parsons on February 15, 2013 and the small quantity of heroin seized from the defendant's residence on March 1, 2013, this established a base offense level of 30. Id., ¶ 61.

There is ample corroboration for CW-1's testimony. During an initial recorded phone call setting up the first heroin purchase, the defendant told CW-1 that CW-1 could get "[w]hatever the fuck you want, you just got to pay for it." Id., ¶ 30. During the first controlled purchase, the defendant correctly determined that he was under police surveillance, correctly determined the federal agency conducting the surveillance (DEA), and correctly identified one of the agents on surveillance. Id., ¶ 32. Even during this abbreviated ten-day DEA investigation, the defendant was recorded telling CW-1 that he was picking up an additional 100 grams of heroin from a supplier; was recorded telling CW-1 he was out making additional drug sales; and was recorded urging CW-1 to come by his house after he picked up heroin so they could add cut to it and increase the amount of heroin they had to sell. Moreover, there was testimony at trial that Monteiro regularly dropped phones. Between February 25, 2015, when Monteiro stole the buy money, and March 1, 2013, when agents searched his house, Monteiro got rid of the phone he had used to talk to CW-1. Several phones were seized from his house. Some appeared to be

three Justices (Scalia, Thomas, and Ginsburg) dissented, the Supreme Court denied the petition for certiorari. 135 S.Ct. 8 (2014).

personal phones, others had limited information on them. Still, agents were able to extract from the phones heroin-related talk from drug customers and noted communications between CW-1 and Monteiro, including, in one instance, CW-1 sending a message to Monteiro noting that the Gonsalves Brothers had been arrested for oxycodone trafficking. Finally, there was ample corroboration for the Gonsalves Brothers robbery (PSR, ¶¶ 22-27) and the defendant robbed CW-1, all of which support CW-1's testimony that the defendant's modus operandi was to sell drugs robbed from other drug dealers. Finally, the defendant was previously convicted of drug trafficking. PSR, ¶ 78. Probation's offense level calculations were correct. United States v. Jones, 744 F.3d 1362, 1367-68 (D.C.Cir.) (district court appropriately based drug weight calculations on corroborated testimony from less-than-perfect cooperating witnesses), cert. denied, 135 S.Ct. 8 (2014).

Probation found that the defendant possessed a dangerous weapon during his drug trafficking activities. PSR, ¶ 62, citing U.S.S.G. 2D1.1(b)(1). Agents seized sets of brass knuckles from the defendant's home when he was arrested, along with heroin packaged for sale (similar to the large cache of heroin from Lopes' residence) and $1400 in stolen buy money. PSR, ¶ 50. For the weapons enhancement to apply, it need not be shown that the weapon was used, or intended to be used, to perpetrate the drug offense. See United States v. Lagasse, 87 F.3d 18, 22 (1st Cir. 1996), citing United States v. Castillo, 979 F.2d 8, 10 (1st Cir.1992), United States v. Ruiz, 905 F.2d 499, 507 (1st Cir. 1990). Rather, for purposes of the enhancement, the First Circuit has repeatedly recognized that:

> When the weapon's location makes it readily available to protect either the participants themselves during the commission of the illegal activity or the drugs and cash involved in the drug business, there will be sufficient evidence to connect the weapons to the offense conduct.

United States v. Ovalle-Marquez, 36 F.3d 212, 224 (1st Cir. 1994), quoting United States v.

Corcimiglia, 967 F.2d 724, 727 (1st Cir. 1992). Just so here – the defendant's brass knuckles

would certainly come in handy when extracting drugs from other drug dealers (particularly when

it is remembered that agents also seized handcuffs from the defendant's home) and in protecting

the drugs and money at his house.

　　　Probation also concluded that, despite the not guilty verdict on Count 5s, the defendant

should be held responsible for the firearm used during the Gonsalves Brother's robbery. PSR,

¶ 62. There is ample evidence that a gun was used during the robbery. CW-1 testified at length

about the plan to lure the Gonsalves Brothers to the defendant's house and to rob them of

$225,000 in cash at gunpoint. CW-2 largely corroborated CW-1's testimony. The Court heard

about the roll-over retaliation by the Gonsalves Brothers against the defendant and his co-

conspirators; the Court heard the three-way jail call where Stanley Gonsalves confirmed the

amount of money stolen, the manner in which it was stolen, and the fact that he and his brother

retaliated against the robbers; the Court heard the testimony of Karen Swift, Stanley Gonsalves'

ex-girlfriend / nurse who observed that Stanley Gonsalves was suffering from a head wound after

the robbery; and the Court heard about the evidence seized from Stanley Gonsalves computer

where Gonsalves searched for Monteiro's name and address after the robbery. PSR, ¶¶9-27.

Using the appropriate evidentiary standard, see United States v. George, 761 F.3d at 60,

Probation correctly attributed the relevant conduct of Monteiro's gun-wielding co-conspirators to

Monteiro – indeed, who would rob two large-scale Cape Cod oxycodone traffickers of $225,000

without a firearm? See United States v. Alejandro-Montanez, 778 F.3d 352, 361 (1st Cir. 2015)

(defendants were either acquitted of a firearm charge or not charged with a firearm charge but all

still properly found subject to enhancement for possessing a dangerous weapon during a drug

trafficking offense: "As the law now plainly stands, 'acquitted conduct, if proved by a preponderance of evidence, . . . may form the basis for a sentencing enhancement'" and record supported application of guideline), <u>citing</u> <u>United States v. Gobi</u>, 471 F.3d 302, 314 (1st Cir. 2006).

Probation also correctly assessed a two-level enhancement because the defendant used and made a credible threat to use violence. PSR, ¶ 63, <u>citing</u> U.S.S.G. § 2D1.1(b)(2). CW-1 and CW-2 described the threats made by the defendant and his co-conspirators to the Gonsalves Brothers to get them to loosen their grip on $225,000 worth of drug proceeds. CW-1 was recorded discussing robbing another drug dealer and threatened CW-1 when CW-1 balked at giving Lopes the buy money on February 25, 2013 ("You act leery, right? Just like last time . . . [t]his is what's going to happen to you, [CW-1], one of two things. Niggas either gonna think you're the police . . . or nigga, you're gonna end up getting robbed"). PSR, ¶44.

Finally, for the reasons set forth in the PSR and in its initial sentencing memorandum, the government believes that Probation correctly assessed the defendant an enhancement for role in the offense, PSR, ¶ 66, and determined that the defendant committed the offense as part of his criminal livelihood, PSR, ¶ 64. Thus, the defendant's GSR was correctly calculated at 324-405 months.

CONCLUSION

For the reasons set forth in its original sentencing memorandum and herein, the

government respectfully requests that the Court sentence the defendant to 360 months in prison.

It is a sentence which is sufficient, but not greater than necessary, to achieve the goals of

sentencing. See 18 U.S.C. §3553(a).

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:     /s/ Christopher Pohl
        Christopher Pohl
        Timothy E. Moran
        Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that this document filed through the ECF system will be
sent electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) on September 8, 2015.

/s/ Christopher Pohl
Christopher Pohl
Assistant U.S. Attorney