**IN THE UNITED STATES DISTRICT COURT
FOR THE FIRST DISTRICT OF MASSACHUSETTS**

**FRANCISCO MONTEIRO,**                        Civil No._____
                      *Movant*                 Crim. No13-cr-10111-DJC

**v.**

**UNITED STATES OF AMERICA,**
                      *Respondent*

## MOTION FOR NEW TRIAL BASED UPON INEFFECTIVE ASSSISTANCE OF COUNSEL PURSUANT TO 28 U.S.C. §2255

### INTRODUCTION

In September 2014, a federal grand jury in Massachusetts issued a five-count superseding indictment charging Monteiro (and two other individuals) with Conspiracy to Distribute Heroin in violation of 21 U.S.C. §846 (Count 1), Distribution of Heroin in violation 21 U.S.C. §841(a)(1) and 18 U.S.C. §2 (Count 2), and Possession with Intent to Distribute Heroin in violation 21 U.S.C. §841(a)(1) and U.S.C. §2 (Count 3). Monteiro alone was also charged with Conspiracy to Commit a Hobbs Act Robbery in violation of 18 U.S.C. §1951 (Count 4), and Using and Carrying a Firearm During and in Relation to a Crime of Violence in violation of 18 U.S.C. §924(c)(1)(A) and 18 U.S.C. §2 (Count 5).

On September 9, 2015, Monteiro was convicted by a jury of all counts with the exception of Count 5 (Casper, J., presiding). As a result, he was sentenced to 250 months.

Monteiro subsequently appealed his conviction to the United States Court of Appeals for the First Circuit arguing six issues: 1) that the drug charges (Counts 1-3) and the robbery charges (Counts 4 and 5) were improperly joined and should have been severed; 2) that the evidence presented at trial was insufficient to convict him for possession with intent to distribute heroin (Count 3); 3) that the district court admitted evidence that was inappropriately prejudicial; 4) that

1

the district court erred in curtailing his attorney's attempt to question defense witness Joshua Gonzalves on redirect; 5) that the jury instructions relating to the terms "aiding and abetting" were flawed; and 6) that the district court improperly applied certain sentencing enhancements when calculating his Guidelines Sentencing Range. The First Circuit affirmed the judgment of the district court. On March 5, 2018, Monteiro filed a petition for a writ of certiorari and, on October 1, 2018, it was denied.

Monteiro files this motion for new trial based upon ineffective assistance of counsel under 18 U.S.C. §2255 because of his attorney's failure to conduct an adequate investigation, failure to review all discovery provided to him by the government, failure to familiarize himself with the Federal Rules concerning jury selection, failing to object to biased or incapable jurors, failing to allow Monteiro a real opportunity to participate in his own defense, failure to request a Carbone hearing, failure to thoroughly and effectively cross-examine certain witnesses impeaching them on crucial issues, and failing to provide to and review with Monteiro all discovery in his possession in a timely manner.

## STATEMENT OF FACTS

The follow facts, framed in a light most compatible with the jury's verdict in accordance with United States v. Manor, 633 F.3d 11, 12 (1st Cir. 2011), are recited verbatim from the Judgment on Monteiro's direct appeal dated September 15, 2017 authored by the United States Court of Appeals for the First Circuit at pages 2-6:

### A. The 2011 Robbery

Monteiro first became friendly with fellow Boston-area drug trafficker Joseph Guarneri in 2009, and Guarneri began selling him oxycodone. Eventually, Monteiro told Guarneri that he could supply him pills at a better price. Soon after, the buyer-seller relationship flipped and Guarneri began purchasing batches of fifty to one hundred oxycodone pills from Monteiro to resell.

Guarneri then began travelling to Florida to purchase larger quantities of oxycodone pills from another supplier. He eventually introduced two other Boston-area drug traffickers, the brothers Stanley and Joshua Gonsalves, to his Florida supplier. After Stanley Gonsalves purchased a large batch of pills from Guarneri's supplier, he asked Guarneri to set up another purchase. Guarneri and Monteiro responded to this request by formulating a scheme to rob the Gonsalves brothers.

Guarneri told Stanley Gonsalves that he could secure 10,000 oxycodone pills in exchange for $225,000. On May 13, 2011 Guarneri lured the Gonsalves brothers to Monteiro's home to execute the purported drug purchase. When the Gonsalves brothers arrived, Guarneri brought Stanley into Monteiro's home, while Joshua remained in his brother's blue Mercedes SUV with another associate and approximately $225,000 in cash. Inside the home, Stanley told Monteiro that he wanted to see the pills so that he could examine and count them. Monteiro told Stanley that he would not show him the pills until Stanley showed him the $225,000. Stanley agreed, and sent Guarneri out of his car to fetch his brother Joshua and the money.

After Guarneri reentered the home with Joshua and the money, two other accomplices who had been lying-in-wait—Tavares Bonnett and Michael Fula – drew their guns and trained them on the Gonsalves brothers. Initially, Stanley refused to hand over the cash to Monteiro. To overcome this resistance, Bonnett hit Stanley on the side of the head with his gun. Stanley then handed the money over to Monteiro and his accomplices. At Monteiro's instruction, Guarneri again went outside to the Gonsalves vehicle to secure any weapons the brothers might have brought with them. After Guarneri found a gun in the vehicle, Monteiro, Bonnett, Fula, and Stanley all rushed out of the house, and Guarneri handed the weapon to Monteiro.

Disarmed, the Gonsalves brothers got into their Mercedes and drove away. At that point, four other individuals who had been hiding in the house rushed out, jumped into a parked Volvo, and sped off in the same direction as the Mercedes. Eventually, the Volvo passed the Gonsalves brother's Mercedes, and the Mercedes rammed the Volvo off the road. Meanwhile, Monteiro, Guarneri, Bonnett, and Fula traveled to the home of Monteiro's grandmother, where they divided the proceeds of the robbery. Monteiro kept most of the money. Guarneri collected $70,000, and the remaining cash was split between Bonnett and Fula.

## B. The 2013 Drug Conspiracy

By 2012, Monteiro had begun selling heroin to Guarneri in batches of either fifty or one hundred grams. Sometimes Monteiro sold him powdered heroin. At other times the heroin was solid, either in the shape of a hockey puck or a tall, narrow cylinder.

In early 2013, the DEA approached Guarneri and informed him that he would soon be facing a federal indictment for drug trafficking. Agents told Guarneri that he could reduce his prison sentence if he cooperated in an investigation against Monteiro, and Guarneri agreed to assist them.

Guarneri first called Monteiro while serving as a DEA informant on February 14, arranging to purchase 100 grams of heroin at a price of $6,500. The following day, Guarneri drove to New Bedford, Massachusetts and picked up Monteiro and Monteiro's cousin, Manuel Lopes, to initiate the heroin sale. Monteiro and Lopes directed Guarneri to a building, and Lopes took Guarneri into an apartment there. Inside, Guarneri gave Lopes and another individual $6,500 in exchange for 96.4 grams of heroin.

On February 20, Guarneri again met with Monteiro, this time to set up a fifty-gram heroin purchase. The two spoke again by phone two days later, and Monteiro directed Guarneri to purchase the drugs from Lopes in New Bedford. When Guarneri met Lopes later that day, however,

4

Lopes told Guarneri that his source was not able to produce the heroin, and Guarneri left empty-handed.

Guarneri again spoke with Monteiro by phone several days later on February 25, and Monteiro confirmed that the sale would go forward that day. He also told Guarneri that they would not be conducting the sale in the same apartment as the previous transaction because Monteiro had robbed the occupant in the interim. When Guarneri traveled to New Bedford to purchase the drugs he found Lopes rather than Monteiro at the site. Lopes tried to coax Guarneri to advance him the money without providing the heroin, but Guarneri refused. Lopes left the site, and Monteiro showed up and berated Guarneri for not trusting his accomplice. Monteiro convinced Guarneri to hand over the money, and he purportedly left to get the heroin. However, Monteiro never came back. Later, Monteiro called Guarneri and falsely told him that he had been stopped by the police and they had seized the purchase money.

Days later, law-enforcement authorities secured arrest warrants for Monteiro and Lopes, and search warrants for their respective residences. Police executed the warrants on March 1. At Monteiro's home, police found $1,300 in currency with serial numbers matching the money that DEA agents had given to Guarneri. They also discovered seven small envelopes of heroin stamped with the word "Future" in green ink. At Lopes' residence, police found thousands of identically packaged envelopes with the green "Future" identifier.

## I.     This motion is timely under 28 U.S.C. §2255(f)(4).

This motion is timely under 28 U.S.C. §2255(f)(1), which provides for a one-year limitations period to run from "the date on which the judgment of conviction becomes final." Likewise, since these claims involve those alleging ineffective assistance of counsel that could not "efficaciously be addressed in the first instance by an appellate tribunal," they are appropriately

raised under U.S.C. 2255(f)(4). <u>United States v. Mala</u>, 7 F.3d 1058, 1063 (1st Cir.1993). *See also* <u>United</u> States v. Walker, 665 F.3d 212 (1st Cir 2011).

**II.**   **Argument**

   **Monteiro was deprived of his right to effective assistance of counsel at trial under the Sixth Amendment to the United States Constitution.**

**A.**   **Standard of Review of Claim of Ineffective Assistance of Counsel**

   The Sixth Amendment guarantees not just a defendant's right to counsel but to effective counsel. <u>McMann v. Richardson</u>, 397 U.S. 759, 771, n. 14 (1970). "In some cases the performance of counsel may be so inadequate that, in effect, no assistance of counsel is provided. In such cases, the defendant's Sixth Amendment right to 'have Assistance of Counsel' is denied." <u>United States v. Decoster</u>, 624 F.2d 196, 219 (MacKinnon, J., concurring), cert. denied, 444 U.S. 944 (1979). <u>United States v. Cronic</u>, 466 U.S. 648 (1984).

   In order to prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the two-prong <u>Strickland</u> standard, namely, "(1) deficient performance by counsel (2) resulting in prejudice." <u>Malone v. Clarke</u>, 536 F.3d 54, 63 (2008) *citing* <u>Rompilla v. Beard</u>, 545 U.S. 374, 380, (2005). "To establish that counsel's performance was deficient, a defendant must show that it fell below an objective standard of reasonableness under the circumstances." <u>Sleeper v. Spencer</u>, 510 F.3d 32, 38 (1st Cir.,2007) *citing* <u>Strickland v. Washington</u>, 466 U.S. 668, 687–688 (1984). "[J]udicial scrutiny of counsel's performance must be highly deferential," and "a reviewing court must not lean too heavily on hindsight: a lawyer's acts and omissions must be judged on the basis of what he knew, or should have known, at the time his tactical choices were made and implemented." <u>Ouber v. Guarino</u>, 293 F.3d 19, 25 (1st Cir.2002) *citing* <u>Bell v. Cone</u>, 535 U.S. 685, (2002). To prove that the deficiency was prejudicial, a defendant must show "that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have

been different." Sleeper, 510 F.3d at 39 *citing* Wiggins v. Smith, 539 U.S. 510, 537, (2003).

Indeed, prejudice requires "a reasonable probability that, absent the errors, the factfinder would

have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695. The prejudice inquiry

is focused on "the fundamental fairness of the proceeding." Id. at 696. Here, taking into account

the errors of trial counsel both individually and cumulatively, there is most certainly a reasonable

probability that the result of the proceedings would have been different but for his errors.

**B.**  **Defense counsel was ineffective during the jury selection process because he failed to familiarize himself with the rules governing jury selection, failed to object to jurors that were incapable of serving, and failed to allow the defendant to be an active participant in his defense.**

It was the defendant's desire to be an active participant in jury selection, which is evidenced

by the fact that he opted to be present at sidebar during the same (Tr.I-5).[1] Despite this fact, his

repeated pleas for his attorney to strike certain jurors were completely ignored.

Prior to trial, the defendant made abundantly clear to his attorney that he was very strongly

opposed to any juror seated who had affiliation with law enforcement.[2] The following jurors, who

were either biased, or otherwise incapable of serving, were seated against Monteiro's continual

objections:

Juror 5 admitted that she had "a bad head cold" so was "not hearing very well." (Tr.I-77).
Although she told the court that she "couldn't even hear some of the questions, hear the questions
[the judge] was saying," and admitted that she "should have stood up more than twice" to the
judge's questions to the group because she was "not processing properly" despite "trying" to do

---

[1] The trial transcripts will be referred to as "(Tr.Vol. )." The Record Appendix will be produced post and will be referred to as "(R. )." The impounded transcript will be referred to as "(Im. )."

[2] Monteiro voiced his objections to his attorney's performance to the judge ex parte during trial. With respect to jury selection, he told the judge, "when it came to picking the jurors, I specially told him that I didn't want any jurors on my jury that had any affiliation with law enforcement, specifically the old lady whose said her husband was a retired officer, the young man that said his friend was a law enforcement for five years, and the lady who said her cousin was FBI agents in New Hampshire or New York maybe. And I specifically told him to strike them three, then when he went up there he said that you told him to use all 10 strikes, and they ended up on my jury. So I didn't get to pick my jury." (Im.).

so, the judge took it upon herself to diagnose the juror's medical condition, deciding she could be seated because her head cold was only "temporary" (Tr.I-78-79).

Juror 24 was married to a retired police officer, who had served for 20 years in Ipswich, Massachusetts, and acknowledged that she had "a lot of friends that are police officers." (Tr.I-94). When defense counsel suggested that "maybe further inquiry should be made" of the juror, the judge disagreed, finding the juror to be "very forthright" (Tr.I-95-96).

Juror 27 admitted that his best friend from childhood had been with the Norwood Police Department for five years (Tr.I-98). Although the juror said he "wouldn't believe" that he would find a police officer more credible than any other witness, defense counsel requested further inquiry because the juror "certainly expressed some hesitancy," and the judge complied (Tr.I-99-100). When the juror then stated that he believed that most people tell the truth regardless of whether they are police officers, it satisfied the judge of his impartiality (Tr.I-101).

Juror 38, who told the judge he was "*worn* in Ethiopia" and grew up in Eritrea, responded affirmatively to the group voir dire regarding difficulty understanding English and, during individual voir dire, admitted that he was able to understand what was said in English only "approximately 75 percent" of the time (Tr.I-107). When asked about his educational background, instead of saying that he had 14 years of schooling, he said, "twelve plus two," "*as* high school back home, two years here" (Tr.I-108). When asked how he was employed, he apparently did not understand the word "employed," asking the judge to repeat the question (Tr.I-108). It was only after the judge restated the question, asking, "How do you work? Where do you work?" that he was able to respond appropriately, stating that he worked in a parking lot (Tr.I-108). Although it was obvious the juror had much difficulty understanding English, defense counsel inexplicitly agreed to him being seated because he "[thought] his English [was] accurate" (Tr.I-108).

Juror 39's uncle was the chief of police in Keene, New Hampshire and her husband's cousins, with whom she was close, both worked for the FBI in the narcotics division out of New York and/or New Jersey (Tr.I-109). These officers shared with her their difficulty working in the narcotics division in New York City (Tr.I-110). Defense counsel requested further inquiry based on her "body language," and his concern that "at least half of the officers here are federal law enforcement" (Tr.I-112). After the juror told the judge that the FBI officers she knew wouldn't want to even go into New York City without their guns, she was nonetheless found to be impartial over trial counsel's objection (Tr.I-112-113).

Because a defendant opts to seek the assistance of counsel, rather than represent himself, it is not an all or nothing, he "need not surrender control entirely to counsel." United States v. Cronic, 446 U.S. 648 (1984). This is true since the Sixth Amendment "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." Faretta, 422 U. S., at 819–820; see Gannett Co. v. DePasquale, 443 U. S. 368, 382, n. 10 (1979)(the Sixth Amendment

"contemplat[es] a norm in which the accused, and not a lawyer, is master of his own defense"). With an individual's liberty at stake, "it is the defendant's prerogative, not counsel's, to decide on the objective of his defense" McCoy v. Louisiana, 138 S.Ct. 1500,1505 (2018). Here, Monteiro had a strong opinion about jury selection and expressed it to his attorney, yet his concerns fell upon deaf ears by his attorney who was wholly confused by the jury selection process. *Compare* Florida v. Nixon, 543 U. S. 175,181,192 (2004)(when counsel confers with a defendant and the defendant remains silent, neither approving nor protesting counsel's proposed concession strategy, the defendant's explicit consent is not required to implement that strategy.) States v. Cronic, 466 U.S. 648 (1984).

The error was structural thus no prejudice need be shown, as it involves Monteiro's both Sixth Amendment right to participate in his defense, and to have an impartial jury. Ristaino v. Ross, 424 U.S. 589, 595 n. 6 (1976)("A fundamental tenet of our criminal justice system, embodied in the Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution, guarantees a defendant an impartial jury."). Even if this Court disagrees, necessitating a showing of prejudice, there is no doubt that at a minimum, the presence of Jurors 5 and 38 prejudiced Monteiro. There was no reason to dispute Juror 38's self-admission that he was only able to understand 75% of what he heard in English. Assuming it was true, the end result was that he based his verdict upon his understanding of only 75% of the evidence, applying only 75% of the jury instructions, ultimately missing 25% of the trial. This was clearly prejudicial. Likewise, the trial judge was not in a position to diagnose Juror 5's illness, as she is a judge, not a physician. Even if she were correct about Juror 5's illness, and it was only a temporary condition, it was unknown when, if at all, her condition improved enough for her to hear all of the evidence.

Not only did trial counsel ignore the defendant's requests to strike certain jurors, but it was painfully obvious that he was wholly unfamiliar with the federal rules regarding jury selection. After the judge told the attorneys how peremptory selection would occur, he was still confused, asking how many they were allotted (Tr.I-117-118). Even after further discussion, he remained oblivious (Tr.I-118). When he became aware that he could strike jurors from the venire, he stated, "you know, I apologize, your Honor. I didn't realize we were doing it that way." (Tr.I-120). The judge then admonished him, stating, "Well, I described it that way a few times, counsel." (Tr.I-120). Counsel then admitted he "didn't understand it" or "explain it to [his] client" (Tr.I-120).

As jury selection continued, defense counsel remained baffled about how selection would work, how many remaining peremptory challenges he had, what jurors had already been challenged, and what jurors had already been excused for cause, twice mistakenly attempting to challenge them (Tr.I-122). Certainly Monteiro was entitled to a competent attorney but failed to receive one. His incompetence deprived Monteiro of his right to participate in jury selection, exercising his pre-emptory challenges as he desired. As such, a new trial is warranted.

**C.**   **Defense counsel was ineffective for failing to renew his motion to continue the trial date in writing, specifically stating the reasons why a continuance was required or, in the alternative, for failing to review evidence provided to him by the government.**

Defense counsel readily admits that he was ineffective for failing to timely request a continuance and, after it was denied, for "foolishly" failing to renew his motion for a continuance, and reducing to writing, including the specific reasons a continuance was warranted (R.1-3). According to defense counsel, the government provided him some 2,000 telephone conversations just 12 days prior to trial (R.1-3). At the final pretrial hearing, 11 days before trial, he requested a continuance orally but, after being denied the same, he failed to follow up with a written motion detailing specifically why he required a continuance, and how the failure to grant one would

prejudice his client (R.1-3). He again asked for a continuance at trial but it was denied (Tr.I-7-9). Defense counsel's failure to timely and effectively request a continuance was not only harmful to Monteiro, but deprived him of his constitutional right to present a defense.

The prejudice to Monteiro is evidenced by the fact that after the trial, and before Monteiro's sentencing hearing, defense counsel was able to review some of this discovery (R.1-3). Based on his review of only a small portion of the same, defense counsel was able to find proof that the cooperating witness, Joseph Guarneri, was residing in the state of Florida for at least 6 weeks during the time he testified that he had been conducting hand to hand drug transactions with Monteiro (R.1-3;4-7). Defense counsel alerted the court to this issue in his sentencing memorandum, after finally reviewing some of the evidence he had not reviewed before trial (R.4-7). Specifically, he noted that on March 13, 2012, Monteiro asked Guarneri where he can be reached and Guarneri replied the next day, "I'm still in Miami just checking on you how was court?" (R.4-7). Then, on April 15, 2012, Guarneri instructed him to call a number with a 305 area code (Miami) to reach him (R.4-7). Based on these texts, and others reviewed by defense counsel post-conviction, it suggests that Guarneri was not in Massachusetts for at least 6 weeks in March and April 2012, when he claimed to have been picking up heroin in hand to hand buys at Monteiro's residence in Massachusetts (R.4-7). This not only effected the amount of drugs attributed to Monteiro for sentencing purposes, but it greatly calls into question Guarneri's credibility as a witness. There was no evidence to corroborate Guarneri's claim that Monteiro was involved in any conspiracy to buy/sell drugs other than on February 14th and March 1st. Had jurors been aware that Guarneri lied about hand to hand transactions that allegedly occurred while he was in the state of Florida, he was also apt to lie about other drug transactions. Had jurors disbelieved

even some of Guarneri's testimony with respect to the length of the conspiracy, the quantity of drug attributed to the defendant could have been significantly reduced thus reducing his sentence.

While the court is afforded significant discretion in determining if a continuance is warranted, here, the defendant's due process rights were violated by his attorney's failure to request a timely continuance, and the court's failure to allow it. Castillo v. Matesanz, 348 F.3d 1 (1st Cir., 2003)(in deciding whether a continuance is appropriate, court must look at a number of relevant factors including, the amount of time needed for effective preparation, the amount of time available for preparation, the amount of time previously available for preparation and how assiduously the movant used that time, the extent to which the movant has contributed to his perceived predicament, the complexity of the case, the availability of assistance from other sources, the probable utility of a continuance, the extent of inconvenience to others, and the likelihood of an injustice or unfair prejudice attributable to the denial of a continuance). Even if this Court determines that it was defense counsel's own doing that led the judge to deny his motion to continue, the end result was that Monteiro was prejudiced and denied his right to due process. Unlike in Castillo v. Matesanz, *supra*, where the trial court found that "counsel's performance during the trial did not reflect that of an attorney noticeably lacking in either experience or competence sufficient to meet constitutional standards," here, counsel's lack of experience and competence, by failing to thoroughly review all pertinent evidence produced by the government prior to trial, was notable.

Should this Court determine defense counsel was not ineffective for failing to reduce to writing his reasons for requiring a continuance, and that there was ample time to review the government's discovery, defense counsel was then ineffective for failing to review the evidence. Indeed, defense counsel's failure to properly review all of the evidence against his client provided

by the government is an act so egregious that a showing of prejudice is not required. *See* United States v. Cronic, at 658. ("There are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified").

Circumstances of a certain magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial. Powell v. Alabama, 287 U.S. 45,53 (1932)(defense counsel appointed on capital case six days before trial and, on the day of trial, a lawyer appeared on behalf of persons "interested" in the defendant, but stated that he had not had an opportunity to prepare the case or to familiarize himself with local procedure, and therefore was unwilling to represent the defendants on such short notice; Supreme Court did not examine the actual performance of counsel at trial, but instead concluded that under these circumstances the likelihood that counsel could have performed as an effective adversary was so re-mote as to have made the trial inherently unfair). Here, while there is ample proof that defense counsel was ineffective, his failure alone to review all of the evidence against his client makes a showing of prejudice unnecessary.

**D.** **Defense counsel was ineffective for his lack of preparation, failure to file crucial motions/opposition, and failure to conduct a thorough investigation.**

Defense counsel's ineptness was woefully obvious at trial. For example, prior to trial, the attorneys discussed the issue of excerpts of transcripts of certain telephone conversations provided by the government it intended to introduce (Tr.I-15). For the first time, defense counsel alerted the judge that there were mistakes in transcribing the conversations/texts that he deemed to be damaging to Monteiro (Tr.I-16). Instead of preparing his own accurate transcripts, or even providing documentation to the court in advance, as to precisely what parts were inaccurate, he

13

failed to do either, "acknowledg[ing] that it would have been better to have transcripts prepared" (Tr.I-16; R.1-3).

Prior to trial, the government filed a motion to preclude evidence of the fact that Gonsalves had obtained a not guilty verdict on the 924(c) violation at his trial (Tr.I-148; R.1-3). This evidence would have been beneficial to Monteiro. Defense counsel was provided the opportunity to respond to the government's motion but failed to do so even after requesting and being granted additional time to respond (Tr.I-48,144). Because of defense counsel's lack of action and attentiveness, Monteiro's opposition to the government's motion was never even entertained (Tr.I-48,144).

Defense counsel's lack of preparation was not lost on Monteiro. On the second day of trial, at Monteiro's behest, defense counsel alerted the judge that his client "pointed out" to him, and was "very much right," that there may be additional evidence beneficial to the case, specifically a telephone conversation between Joseph Guarneri and Michael Fula while Guarneri was incarcerated at Walpole (Tr.II-15). The prosecutor responded by informing the court that he had no such knowledge of the call but, in any event, such evidence was not in the custody of the government but instead of the jail, noting that it would have been available to defense counsel had he only subpoenaed the information (Tr.II-17). Because this information was not timely subpoenaed by defense counsel, any benefit it may have had to Monteiro at trial was lost. *See* Ayestas v. Davis, 138 S.Ct.1080 (2018)(defense counsel's failure to investigate constituted ineffective assistance where client faced a possible death sentence and, after his investigator uncovered a history of head trauma and substance abuse, counsel conducted no further inquiry).

Defense counsel's unfamiliarity with the federal rules of evidence was also apparent with respect to witnesses he called, or attempted to call, on Monteiro's behalf. When the Monteiro's neighbor, Wentworth, failed to appear for trial despite being subpoenaed, defense counsel made a

flailing attempt to introduce Wentworth's statement through his investigator (Tr.VII-11). Because there was no showing that Wentworth was unavailable, and such evidence was inadmissible hearsay, defense counsel's request was denied (Tr.VII-11-12). Defense counsel appeared to be oblivious to the rule allowing the court to issue a bench warrant for a witness's failure to appear under subpoena asking, "Isn't the next step for the Court to issue some sort of an order to try to enforce the subpoena?" (Tr.VII-12). Then, rather than ask for a bench warrant, he merely asked the judge to note his exception despite her confirming on the record that he had still not asked for a warrant (Tr.VII-12). Ultimately, Monteiro was deprived of having jurors consider Wentworth's testimony.

The same held true with another witness, an insurance adjuster, who had been properly served but failed to appear at trial (Tr.VII-14-120). Instead of asking for a bench warrant, defense counsel appeared unphased by the lack of appearance of yet another defense witness, requesting that the records he sought to introduce through that witness be admitted under the business record exception (Tr.VII-14-20). The judge informed him that the records did not qualify as business records under the rules; the prosecutor ultimately agreed to stipulate only to the introduction of photos of the vehicle involved in the accident two days after the robbery (Tr.VII-14-20). Defense counsel was prohibited from introducing all the evidence he initially sought to introduce through the non-appearing such witness, thus it was never contemplated by jurors.

Finally, despite that defense counsel went to the effort of calling an expert witness, he failed to utilize her effectively. Because this expert in the field of accident reconstruction was called to specifically dispute the testimony of the government's witnesses with respect to how the accident occurred, it was vital that she be present during their testimony so she could address why their recitation of the accident was inaccurate or untruthful. Instead, defense counsel called his

expert witness into the courtroom mid-way through the testimony of Gonsalves (Tr.VII-99-100).[3]

The prosecutor later highlighted on cross-examination the fact that the expert was not present when

any of the other government witnesses testified about the accident, was not privy to their testimony,

and thus not able to consider it when rendering her opinion (Tr.VII-198).

As the trial went on, Monteiro could no longer sit idly by watching his case implode at the

hands of his defense attorney. On day 7, he lodged his objections to his attorney's incompetence

ex parte. Specifically, the defendant voiced an objection to his attorney's failure to request a

"Carbone hearing" with respect to certain recordings he felt had been deleted or altered despite

defense counsel's repeated promises to him to do it.[4] Monteiro also objected to his attorney's

failure to request additional discovery from the government per his request despite his promise to

do so. Because this discovery was never timely requested by his attorney, Monteiro asked him at

---

[3] While Joshua Gonsalves was in the midst of testifying, defense counsel requested a side bar, telling the judge that he wanted his expert to hear Gonsalves' testimony but that he "inadvertently [] forgot to alert [the court] earlier," asking permission to have her enter the court during Gonsalves' testimony, and to allow Gonsalves to repeat his testimony regarding how the accident occurred. The prosecutor objected, noting, "If he wanted her to be here, he should have done that." (Tr.VIII-99-100). The judge allowed her to enter, but refused to allow the witness to repeat his prior testimony (Tr.VII-99-100).

[4] This was important because, not only did the conversations consist of evidence that Monteiro was guilty of the charges for which he was indicted, but the contents were also used in sentencing. For instance, had the conversations been excluded completely, the statement by Monteiro that the court deemed to have been a threat of physical violence, earning him two points, wouldn't have been a factor. Likewise, had defense counsel successfully argued that the entirety of the conversations been introduced, rather than merely excerpts cherry picked by the government, jurors would have learned that Guarneri was in the state of Florida for at least 6 weeks during the time Monteiro was alleged to have been involved in a conspiracy with him. Defense counsel failed to file any pre-trial motion that would have excluded such evidence, or allowed evidence exculpatory to his client to be introduced, despite promising to Monteiro that he would do so. Instead, he did nothing, allowing the government to select only the most incriminating conversations in which Monteiro participated.

trial to question Agent Rideout about the protocol surrounding activating an informant, since it was not done correctly. He failed to do so.[5]

As a direct result of defense counsel's ineptitude, there occurred a significant breakdown in the relationship between attorney and client. Monteiro complained ex parte that during trial, "we were sitting here arguing about the questions that I required him to ask the government's witnesses on cross-examination. He wouldn't ask them in the middle of my trial." (Im.). He also complained that certain pre-trial motions were not filed as promised by his attorney, who told him that there was still time to file them but never did. With respect to the discovery that defense counsel was provided by the government less than 21 days before trial, specifically CDs containing 600-700 pages and, when Monteiro asked for copies for his own review, he was told by defense counsel that he 'couldn't afford' to make copies and mail them (Im.;R.1-3).[6] According to Monteiro, at the time of trial, he was "just getting to the phone records that could have been used on [his] behalf at [his] trial to prove that [he] wasn't in contact with the informant, Joseph Guarneri." (Im.). Indeed, at trial, Monteiro felt "as though [his attorney] brought him to trial unprepared," stating, "He basically, like lured me in because every time I asked him to withdraw from my case, he would tell me he was going to do certain things that I asked him to do and he would just never end up doing it. By the time I got to trial, it was too late for me to do the things that I asked him to do that would benefit me for my trial." (Im.).

---

[5] Defense counsel admits that he "wasn't thoroughly prepared" for the cross-examination of Agent Rideout (R.1-3).

[6] Defense counsel acknowledges that upon getting the discovery from the government, he told Monteiro that he "couldn't afford to make copies and mail them," not in a financial sense, but rather time-wise because he did not have an associate, paralegal, or assistant (R.1-3).

Defense counsel readily admits that he "completely dropped the ball with respect to the cross-examination of Michael Fula" (R.1-3).[7] His affidavit mirrors Monteiro's claim that after Fula's testimony defense counsel visited Monteiro in lock up and apologized for his mistakes, as he failed to impeach Fula on several crucial issues (R.1-3).

"[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." United States v. Cronic, 466 U.S. 648, 659 (1984). No specific showing of prejudice was required in Davis v. Alaska, 415 U.S. 308 (1974), because the petitioner had been "denied the right of effective cross-examination" which " 'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.'" Id., at 318 citing Smith v. Illinois, 390 U.S. 129, 131 (1968), and Brookhart v. Janis, 384 U.S. 1, 3 (1966). Here, such a constitutional error did occur.

## III.   Conclusion

Defense counsel acknowledges that he was "just not on [his] game during the trial, and the defendant was prejudiced as a result" (R.1-3). For all of the errors made by trial counsel, both individually and cumulatively, the reasons set forth above, Monteiro respectfully asks this Court to vacate his conviction and sentence, and award him a new trial. Monteiro also seeks a hearing on this motion under 28 U.S.C. §2255 (b).

---

[7] Monteiro informed the judge that even though they prepared for months, all the questions to be asked of Fula intended on impeaching him with many critical inconsistencies. But after defense counsel sat down from cross-examining Fula, Monteiro "asked him, Why did you do that to me? He hushes me up. When go downstairs, I'm upset. He tell me he didn't do it on purpose, he didn't prepare to cross—he wasn't prepared or the cross-examination. How could you - - my life is on the line, how could you not prepare for the cross-examination of a government's witness."" (Im.).

Respectfully submitted,
Francisco Monteiro,
By his attorney,

/s/ Frank Camera

70 South Main Street
Fall River, MA 02721
(508) 677-2878
BBO No. 635930

October 1, 2019

## **Record Appendix**

Affidavit of Raymond Gillespie                                    R.1-3

Sentencing Memorandum – (pages 6-9)                     R.4-7

R1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE FIRST DISTRIC OF MASSACHUSETTS

**FRANCISCO MONTEIRO,**                          Civil No._____
                     *Movant*                    Crim. No13-cr-10111-DJC

v.

**UNITED STATES OF AMERICA,**
                     *Respondent*

### AFFIDAVIT OF RAYMOND GILLESPIE

I, Raymond Gillespie, under oath do depose and state:

1.     I am the attorney who represented the defendant, Francisco Monteiro, at trial in the above named matter.

2.     Before the trial began, I moved to continue it to a further date to enable me to review all of the discovery that had been provided to me by the government close in time to the trial date. Specifically, there were over 2,000 cell phone communications including text messages, pictures and audio that I had not had the opportunity to review prior to trial. Because I never reviewed this evidence, I was not in a position to determine whether any of it was exculpatory to the defendant.

3.     The aforementioned telephone communications were provided to me on March 10, 2015, only 12 days before the March 23, 2015 trial date. At the final pretrial hearing on March 11, 2015, I complained to the court that there was not enough time to review them and that I would likely need a forensic cell phone expert to help me. I asked the court for a continuance and the judge denied my motion. Foolishly, I failed to request a continuance in writing in a timely manner, to the detriment of my client.

4.     After the trial ended but before the defendant was sentenced, I was able to review some of those telephone communications. Based on a very limited review of the communications, I was able to find significant evidence that Guarneri could not have been buying heroin from Monteiro in Massachusetts, as he claimed at trial, during a significant portion of 2012 into January of 2013.

5.     The instant messaging texts sent by Guarneri to Monteiro clearly indicate that Joey was in Florida from March 13, 2012 to April 26, 2012.  See Defendant's Sentencing Memorandum, Document 336, filed August 19, 2015, pp. 7-9. Coupled with Guarneri's admission to the Grand Jury in April, 2013 that he did not buy any heroin from Monteiro between December 5, 2012, when he was arrested in a new state case, and the first undercover buy in the present federal case on February 15, 2013, Id. p. 9, that wipes out almost four months at 100 – 200 pills per month.

R2

6.  The court found at sentencing that Monteiro was responsible for a minimum of 1300 oxycone/heroin pills (1,300 grams) that he was supposedly selling to Guarneri from March 2012 until March 2013.   PSR at 12.   She declined to subtract even the minimum 400 grams represented by my analysis of the cell phones extract outlined above.

7.  If the above analysis of a mere fraction of the cell phone extracts produced substantial evidence that Guarneri was lying about how much heroin he was buying from Monteiro, then it was critical for the defense to perform a thorough forensic review of all nine cell phones seized by law enforcement for evidence which could possibly further impeach Guarneri's credibility.

8.  In retrospect, I believe that I rendered ineffective assistance of counsel by not following up my March 11 in-court protest of late notice with a detailed motion to continue the trial for the time necessary to review and digest the voluminous cell phone extracts and, if necessary, take this critical discovery issue up on interlocutory appeal.

9.  After receiving this late discovery, the defendant asked me for a copy of everything so he could review it at the jail while awaiting trial. I admit that I told him that "I couldn't afford" to make and mail him copies. I meant this not from a financial standpoint, but rather from a time perspective, as I did not have an assistant to help me with such a voluminous task. As a result, the defendant was not able to review all of the aforementioned discovery, prior to trial.

10.  I was aware that the defendant was vehemently opposed to having anyone on the jury with any affiliation to law enforcement. I agreed with this strategy, and that having jurors with law enforcement affiliations was not in his best interest. Unfortunately, jurors with law enforcement affiliations ended up on the jury against the defendant's wishes because I was completely confused during jury selection about the judge's rules regarding the exercise of pre-emptory challenges.

11.  In preparing this affidavit, I have discussed with the defendant's current attorney the possibility that two jurors, Jurors 5 and 38, may have been incapable of serving for medical or language difficulties. Although I failed to object at the time, I regret that decision, as it is clear to me now that they were likely incapable of adequately serving as jurors.

12.  Prior to trial, the government filed a motion to preclude evidence of the fact that Gonsalves had obtained a not guilty verdict on the 924 (c) violation. I fully intended to file a response, and did inform the defendant that I would be filing a response. Unfortunately, I failed to do so thus the government's motion was allowed without any opposition.

13.  On the second day of trial, the defendant pointed out the fact that there may be additional evidence very beneficial to his case, specifically a telephone conversation between Joseph Guarneri and Michael Fula while Guarneri was incarcerated at Walpole. I regret

23

not subpoenaing this information, as it very well may have contained exculpatory evidence that I could have used at trial to aid in the defense.

14. I admit that I wasn't thoroughly prepared for the cross-examination of Agent Rideout and failed to cross-examine him as scrupulously as I could have. During the trial, the defendant requested that I ask certain questions of Agent Rideout. I did not. It was not a strategic decision to omit them.

15. I completely dropped the ball with respect to the cross-examination of Michael Fula. Prior to trial, I was prepared to impeach him with on many fronts, as his story was inconsistent with both what he had testified to before the Grand Jury, and to what other witnesses testified. As soon as I sat down from my cross-examination, I knew I had made a mistake.

16. Immediately after that cross-examination, I visited the defendant in lock up and apologized to him for my mistake. I felt terrible because I knew I missed a crucial opportunity to raise reasonable doubt in the government's case. I do believe that had I asked the questions I had planned and was prepared to ask, it would have made a difference at trial.

17. Unfortunately I was just not on my game during this trial, and the defendant was prejudiced as a result. The errors I made at trial caused a serious breakdown in communication between the defendant and me during trial, which is evidenced by the ex-parte discussion between him and the judge. Although I tried my best, and did many things right, I do feel that I was ineffective, somewhat unprepared, and not up to my full capacity in representing this defendant. As such, it is my opinion that the defendant is owed a new trial.

Signed under the pains and penalties of perjury this 30th day of September, 2019:


/s/Raymond E. Gillespie_____
Raymond E. Gillespie

late 2009.  Exh. A,  5-6, 10-11.  He had previously alleged the same facts in his proffer of March

25, ("400 to 500 pills from Monteiro monthly during this timeframe"), Exh. C, p. 7,

and under oath to the grand jury on April 10, ("I would get either fifty to a hundred

oxycodone...at that time"), both in 2013.  Exh. B, p. 7.  In his September 3, 2014 proffer session

with AUSA Hoffman, the latter's handwritten notes clearly indicate a detailed review of

Guarneri's history of trafficking in oxycodone.  Exh. C, pp. 19-22.   Various individuals involved

in the illegal "oxy" distribution business are noted, e.g. Anthony Silva ("AS"), David Gonsalves

("DG"), Stanley Gonsalves ("SG"), Mike Herlihy ("MH") and Randy Newell ("Rambo").  The

time frame encompasses 2009, 2010 and beyond.  The document indicates that Guarneri was

reminded at the beginning of the proffer that his plea agreement required him to be truthful and

honest [3] ("Plea Agreement - signed - requires - truth, honest" [sic]).  In spite of that, there is no

mention whatsoever of Francisco Monteiro, or "FM", in the document.  When queried about that

omission during the trial, Guarneri was evasive, claiming that the interview was focused only on

the Gonsalves trial.  Exh. A, p. 13.  But he talked about selling cocaine and heroin also, although

they were not part of the Gonsalves trial.  Exh. C, p. 20.  It is also notable that, as referenced

above, in the March 25, 2013 proffer his recollection was that he was buying 400 -500 pills

monthly from the defendant.  But at trial it was 50-100 pills approximately every two weeks.

That is as little as 100 per month or a maximum of 200 pills monthly.  That less than half his

prior estimate was.

    This historical narrative is Guarneri's and his alone.  There is absolutely no corroboration

from any other source be it circumstantial or direct.  No one testified to the frequent visits

Guarneri claims he made to Francisco's house.  There was no evidence of any telephone logs to

6

show any telephone calls between the two during the applicable period.  This is suspicious given

that Guarneri testified at trial that he was in frequent telephone and messaging contact with

Monteiro during the time in question, Exh. A, p. 9, and the government seized at least nine cell

phones belonging to defendant on March 1, 2014.  Three of them yielded, *inter alia,* thousands

and thousands of electronic records of calls, texting, messaging, and chats.  Government's exhibit

N-14 was the extraction from one of the phones.  If anything, the only pertinent information

found to date in that extraction by the undersigned tends to impeach Guarneri's story.

 For example,  there was a short series of instant messages between the two from March 13

to April 26, 2012 while Guarneri was in Miami, Florida.  Exh. D, p. 1.  On March 13th,

Francisco asks him for a number where he can be reached.  Guarneri replies the next day that,

"I'm still in Miami just checking on you how was court?"  Francisco describes his day in court.

There are no more chats between the two until April 13 when defendant writes, "I tried calin [sic]

them two numbers I had fa u but you aint pic up".  The next morning Guarneri replies, "Call me

again I don't have your number".  The next day, April 15, 2012 Francisco asks him "what # you

want me to call [?]"; he then follows up 20 minutes later telling Guarneri that the "305 # you

gave me said wrong # and that [illegible, "B&$"?] aint pic up, 7743651408 aint pic up but if

thats you my# that 401. or you just got me callin wrong #s?"  305 is, of course, the principle

Miami area code.  https://en.wikipedia.org/wiki/Area_codes_305_and_786.     The next

communication is on April 26, 2012 and it strongly suggest Guarneri has been in Florida since at

least March 13: "Cuz, I left my phn in the cup holder when I turns the rental in I aint got no phn

till tmmrw.  Hit you as soon as I get my shit back." Id.  What this implies is that Guarneri was

gone from Massachusetts for at least six weeks in March and April, 2012, precisely during the

first two months of a prolonged period when he claims to have been picking up heroin in hand-

to-hand buys at defendant's house Massachusetts.  This must be viewed in light of his admission

at to the grand jury on April 10, 2013 that he did not buy any heroin from defendant between the

December 5, 2012 arrest in his new state case  and the first undercover buy on February 15, 2013.

Exh. B, pp. 10-11. Combined they demonstrate that Guarneri could not have been getting heroin

from Francisco for at least sixteen weeks out of the claimed one year.  That is well over 25 % of

the whole year.  And that is just what the record shows.  But it strongly implies that if he was

willing to ignore those gaps in his narrative it is quite likely that he has ignored others. More

importantly, if we obviously cannot believe him regarding a significant part of his narrative, why

should we believe him about the rest?

The sheer implausibility of some of Guarneri's testimony is striking.  For example, how are

we to accept that he immediately began discussing his oxycodone trafficking at a chance meeting

with someone he had not seen since grade school, presumably some twenty years earlier?  Yet

that is what he claimed happened near the Cranberry Manor apartments in late 2009 with

Francisco.  That just goes against common sense.  Serious illicit drug dealing is a clandestine,

dangerous business.  Even the slightest risk of exposure can result in catastrophe.  Informants and

cooperators are prolific.  The allegation is even more suspect when one considers that Guarneri

made no mention of  oxycodone trafficking with Monteiro in the September, 2014 proffer to the

prosecutor referred to above.  He identifies five or six such traffickers but not Monteiro?

Other glaring miscues are when he says in the February 8 proffer that Stanley Gonsalves

came to the rendezvous spot on May 13 with "several other males" in his car and that LG jumped

out of the closet with several other young males.  Exh. C, p. 4. How do you mistake one for

several?

Mindful of the above recital of inconsistent, contradictory and simply hard-to-believe

testimony and statements has given during the course of the present investigation and litigation, it

is not surprising that he was so uncertain of the dates, frequency and amounts of heroin that

Francisco was allegedly handing over to him in the twelve months prior to February 15, 2013.

It was only on the second day of his testimony in the present case, after being so vague and at a

loss for specifics on the first day, Exh. A, p. 6 ("I can't give you an -- I don't know an exact time,

but -- I'm just trying to put the timelines together"[4]), that he suddenly was able estimate both

figures. Exh. A, p. 8.

### Applicable Law

"In drug-trafficking cases under the sentencing guidelines, sentences are largely quantity-

driven." United States v. Sepulveda, 15 F.3d 1161, 1196 (1st Cir. 1993)(citations omitted). See

also United States v. Bradley, 917 F.2d 601, 604 (1st Cir. 1990)(drug quantity a "key datum" for

sentencing purposes). At sentencing, the government must prove drug quantities by a

preponderance of the evidence. United States v. Sklar, 920 F.2d 107, 112-13 (1st Cir. 1990).

"Courts must sedulously enforce that quantum-of-proof rule, for, under the guidelines, drug

quantity has a dramatic leveraging effect." Sepulveda, at 1198.

The court is required to make an individualized finding as to the quantity of drugs

attributable to, or foreseeable by, a particular defendant. United States v. Colon-Solis, 354 F.3d

101, 103 (1st Cir. 2004). Drug quantity attributable to the conspiracy as a whole cannot be

---

4       And that was in the context of with blatant coaching: "Q. "So in that period of time, in the -- I mean, are
we talking months before two thousand -- February of 2013? A. Yes. ... Q. How about a year? A. Yes." Exh. A, p.
6.

CERTIFICATE OF SERVICE

I, Frank D. Camera, hereby certify that this document filed through the ECF system was sent electronically to the registered participants as identified on the Notice of Electronic filing on October 1, 2019.

/s/ Frank D. Camera