UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cr. No. 13-10111-DJC |
| ) | |
| 1.   FRANCISCO MONTEIRO, ) | |
|         Defendant ) | |

**GOVERNMENT'S OPPOSITION TO MOTION FOR NEW TRIAL BASED UPON
INEFFECTIVE ASSISTANCE OF COUNSEL PURSUANT TO 28 U.S.C. § 2255**

Now comes the United States, through undersigned counsel, and respectfully submits this memorandum in opposition to Francisco Monteiro's motion to vacate his conviction and sentence and grant him a new trial pursuant to 28 U.S.C. § 2255.  ECF No. 433.  On April 6, 2015, after an eight-day jury trial, Mr. Monteiro was convicted of conspiracy to distribute heroin, in violation of 21 U.S.C. § 846 (Count 1); distribution of heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 2); possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § (2) (Count 3); and conspiring to commit a Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count 4).  ECF No. 282.  He was acquitted of using a firearm during the robbery (Count 5).  ECF No. 282.  On September 9, 2015, this Court sentenced Monteiro to 250 months in prison on Counts One-Three and a concurrent 240 month sentence on Count Four.  ECF No. 345.  On September 15, 2017, the First Circuit affirmed Monteiro's conviction.  *United States v. Monteiro*, 871 F.3d 99 (1st Cir. 2017).[1]

Monteiro is now seeking habeas relief pursuant to 28 U.S.C. § 2255 because he claims that his trial counsel, Attorney Raymond Gillespie, rendered ineffective assistance of counsel during

---

[1] The First Circuit's opinion in *Monteiro* provides a comprehensive overview of the evidence presented at trial. In this opposition, the government supplements that overview with discrete references to the trial record and to the Pre-Sentence Report ("PSR").

his 2015 jury trial. In support of Monteiro's motion, Attorney Gillespie filed an affidavit where he claims his performance was deficient. For the reasons set forth below, Monteiro's motion should be denied without a hearing.

## I.     LEGAL STANDARD

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth the federal constitutional standard by which claims of ineffective assistance are evaluated. *Strickland* requires a petitioner to demonstrate that "counsel's representation fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. To establish that a lawyer's performance is deficient under *Strickland's* first prong, the defendant must show that, "given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it." *Tevlin v. Spencer*, 621 F.3d 59, 66 (1st Cir. 2010) (quoting *Knight v. Spencer,* 447 F.3d 6, 15 (1st Cir. 2006)). The performance inquiry focuses on "the objective reasonableness of counsel's performance, not counsel's subjective state of mind," *Harrington v. Richter*, 562 U.S. 86, 110 (2011), and the defendant must overcome a "strong presumption . . . that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation marks omitted). Review of an attorney's performance is "highly deferential" and courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. *See Argencourt v. United States*, 78 F.3d 78 F.3d 14, 16 (1st Cir.1996) (in reviewing ineffective assistance claims, Court must seek "to eliminate the distorting effects of hindsight").

To establish prejudice under *Strickland's* second prong, the defendant must show a "reasonable probability" that the outcome would have been different – *e.g.*, that he would not have

been convicted at trial – but for counsel's errors. *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (per curiam); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *United States v. Rivera-Cruz*, 878 F.3d 404, 410 (1st Cir. 2017); *Peralta v. United States*, 597 F.3d 74, 79-80 (1st Cir. 2010). In assessing prejudice, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Richter*, 562 U.S. at 111. "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different . . . [t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at 111-12 (citation omitted). "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). A reviewing court need not "address both requirements if the evidence as to either is lacking." *Sleeper v. Spencer,* 510 F.3d 32, 39 (1st Cir. 2007).

In all respects, the burden of proof is on the petitioner. *Wilder v. United States*, 806 F.3d 653, 658 (1st Cir. 2015). When "a petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing." *United States v. McGill*, 11 F.3d 223, 225 (1st Cir. 1993); *Indelicato v. United States*, 106 F. Supp. 2d 151, 154 (D. Mass. 2000).

## II.   ARGUMENT

To receive relief under § 2255, Monteiro must show that trial counsel's performance was patently unreasonable *and* that those errors created a reasonable probability that undermines confidence in the jury's decision to convict Monteiro of the drug trafficking and robbery charges. *Rivera v. Thompson*, 879 F.3d 7, 12 (1st Cir. 2018). A careful review of the record shows that

Monteiro received effective assistance of counsel and that evidence against him was so compelling that trial counsel "errors," if any, do not undermine confidence in the jury's verdict.

### A. Trial Counsel Was Effective During Jury Selection And The Court Empaneled An Impartial Jury.

Monteiro argues that trial counsel was ineffective because he did not use peremptory strikes to remove every juror who had any affiliation with law enforcement and that this Court therefore empaneled a jury that was "either biased, or otherwise incapable of serving." ECF. No. 433 at 7-8. Monteiro argues that Jurors 24, 27, and 39 were biased because they had an affiliation with law enforcement, that Juror 38 was incapable of serving because he was not able to understand English well enough to serve on the jury, and that Juror 5 was incapable of serving because of "a bad head cold." *Id.* Even a cursory review of the trial record shows these claims to be meritless.

Determinations of bias and ability to serve during jury selection is "particularly within the province of the trial judge." *Skilling v. United States*, 561 U.S. 358, 386 (2010); s*ee also United States v. Sampson*, 820 F.Supp.2d 151, 168 (1st Cir. 2011) ("[t]here are few aspects of a jury trial where [the First Circuit] would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause."). The Court thoughtfully asked probing questions of all five jurors at issue and determined that each juror was unbiased and capable of serving. *See* 3/23/2015, Tr. 77:19-79:15 (Juror 5); Tr. 94:8-96:12 (Juror 24); Tr. 98:2-101:17 (Juror 27); Tr. 107:13-109:9 (Juror 38); Tr. 109:10-113:3 (Juror 39).

Monteiro's motion asserts that Jurors 24, 27, and 39 were biased but offers no support for that assertion beyond the fact that each juror knew someone connected to law enforcement. ECF No. 433 at 7-8. Of course, there is no *per se* rule barring jurors from sitting on juries when they have some affiliation with law enforcement. *Skilling*, 561 U.S. at 386. Instead, the trial judge must exercise discretion to determine if the potential juror's connection to law enforcement would

affect the juror's ability to fairly and impartially hear the evidence and decide its outcome without bias or prejudice for either side. *Id.*

The excerpt of the exchange with Juror 24 is an example of the care with which the Court conducted its examination of prospective jurors:

> **THE COURT**: And obviously you mentioned also knowing other police officers, obviously. So obviously there are going to be police officers called in this case, and what I'm concerned about is obviously regardless of who you may know outside in the world, whether or not you can be fair and impartial in listening to the testimony of all the witnesses, including law enforcement officers.
>
> **JUROR 24**: I would think I would hear the other facts of the case and the evidence.
>
> **THE COURT**: Okay. Meaning that someone – the mere fact that someone's a police officer wouldn't make them more credible to you?
>
> **JUROR 24**: No.

When Attorney Gillespie suggested that Juror 24 was perhaps under-valuing her connections to law enforcement, the Court responded:

> Again, counsel, I think I have to listen not just to the substance of what the juror says, but just sort of responding to her body language and how she answers questions. I think she was actually very forthright. I didn't think she was blowing off or minimizing, so I'm going to return her to her seat.

*See* 3/23/2015, Tr. 94:8-96:12. The Court's colloquies with Jurors 27 and 39 produced similar, unobjectionable answers. *See* Tr. Tr. 98:2-101:17 (Juror 27 informed the Court that his best friend was a police officer but that "I don't know a lot of details about" his work and when asked whether he was more inclined to believe the testimony of a police officer simply because he was a police officer answered, "I don't think so") and Tr. 109:10-113:3 (Juror 39 did not believe the fact that she had an uncle and cousins in law enforcement would affect her ability to be impartial and would not automatically credit the testimony of a police officer). And the record shows that the Court did

5

excuse potential jurors when warranted. *See* Tr. 84:21- 85:4 (Court struck Juror 7 for cause after he explained that his brother, a Boston Police officer, had been shot in the line of duty: "**THE COURT**:  Well, I guess I'm going to allow the motion to strike.  I think—I agree with [Mr. Pohl] *that the substance of [Juror 3's] words themselves might not be cause* or the circumstances might not be cause, but I also, as much as I think this juror wanted to be fair and impartial and not exclude himself from this jury, I think he was—by answering my questions about that with the responses about people in his life who have been harmed by bullets, *I think that was telling*, so I will strike him") (emphasis added); Tr. 86:22-89:5 (Court excused Juror 16 for cause after Juror 16 advised he had immediate family members who worked for the DEA – the lead law enforcement agency in the case against the defendant – and "they tell me a lot about what's going on").

Monteiro's argument concerning Jurors 5 and 38 fare no better. During questioning by the Court, Juror 38 acknowledged that English was not his first language. *See* 3/23/2015 Tr. 107:16-108:12 ("**THE COURT:**  Sir, I think you answered my question about difficulty understanding English?  **JUROR:**  Yes, I have difficulty understanding.  **THE COURT:** Were you able to understand my questions this morning?  **JUROR:**  I understand, like, approximately 75 percent.  **THE COURT:**  Sir, can I ask you where are you from originally?  **JUROR:**  Ethiopia.  I was worn [sic][2] in Ethiopia, I grew up in Eritrea.  **THE COURT:**  And, sir, how long have you been in the United States?  **JUROR:**  I've been here since '98"). Monteiro now complains that this juror was seated, ECF No. 433 at 9, but the record appears to show that both Attorney Gillespie and Monteiro approved of this juror. After the exchange quoted above, the transcript reflected the fact that Attorney Gillespie spoke to Monteiro privately, then returned to side-bar (with Monteiro

---

[2] Monteiro claims the fact that "worn" is in the transcript is evidence of the juror's lack of command of English. ECF 433 at 8. In the government's view, it seems much more likely to be a simple typographical error in the transcript.

beside him) and advised the Court, "I think he could serve, Your Honor. I think is English is accurate." *Id.* The Court agreed and returned him to the panel.[3] Finally, Monteiro's complaint about Juror 5's "bad head cold" should be summarily rejected: the Court's colloquy with Juror 5 revealed she was able to fully comprehend the Court's instructions.[4]

Monteiro's argument fails the performance prong because trial counsel (1) asked for further inquiry of *every* potential juror who had an affiliation with law enforcement,[5] (2) challenged most

---

[3] By contrast, the Court did excuse Juror 6 after it became clear that he was not comprehending the Court's questions (3/23/2015 Tr. 79:23-80:8 ("**THE COURT:** Sir, where do you work? **JUROR:** Warehouse. **THE COURT:** [W]ere you able to follow my questions? **JUROR:** I don't understand. **THE COURT:** The questions that I asked you before, were you able to follow them? **JUROR:** Ask me the question."). Again, defense counsel consulted with Monteiro before making agreeing to exclude the juror. See Tr. 80:16.

[4] 3/23/2015 Tr. 77:21-78:17 ("**THE COURT:** Ma'am, I think you answered one of my questions, disability. **JUROR:** It's just that I have a bad head cold, so I'm not heaving very well. I couldn't even hear some of the questions, hear the questions you were saying. I probably should have stood up more than twice. I'm not processing, I'm trying. **THE COURT:** Did you also mention something about hardship? **JUROR:** I have a business trip that's scheduled for this Thursday, flying down to DC, so I didn't realize that this would take as long as it did. **THE COURT:** Okay. **JUROR:** So— **THE COURT:** And is it something—we only—well, were you just going to be down there for the day and then back? **JUROR:** For the day, yeah. **THE COURT:** Is it something that can be rescheduled? **JUROR:** It can be. It's a face-to-face meeting where we make decisions about what products we keep and what products we kill. Delaying that obviously affects people and what they do, so—").

[5] 3/23/2015 Tr. 74:15-21, 77:12-13 (Trial counsel asked that further inquiry be made of Juror 3 because her cousin and neighbor are in law enforcement and he was "very concerned." After further inquiry, trial counsel challenged Juror 3.); Tr. 82:1-85:11 (Trial counsel challenged Juror 7 who was a retired correction officer and had a brother who is a police officer in the Boston Police Department. Juror 7 was removed for cause); Tr. 86:23-89:7 (Trial counsel challenged Juror 16 who has a brother in the Massachusetts State Police and a brother-in-law in the DEA. Juror 16 was removed for cause.); Tr. 89:8-90:11, 119:14 (Trial counsel directly questioned Juror 17 who has an uncle in the Wakefield Police Department. Juror 17 was not excused for cause and trial counsel later used a preemptory strike to remove her.); Tr. 94:8-96:12 (Trial counsel asked that further inquiry be made of Juror 24 because her husband was a retired police officer.); Tr. 98:2-101:17 (Trial counsel asked that further inquiry be made of Juror 27 because his childhood friend was a police officer.); Tr. 109:10-113:3 (Trial counsel asked that further inquiry be made of Juror 39 because her uncle and husband's cousins work in law enforcement).

7

of those jurors for cause, (3) used a peremptory challenge to remove a juror affiliated with law enforcement,[6] and (4) asked for further inquiry of jurors he thought were otherwise incapable of serving.[7] Trial counsel's performance at jury selection fell well "within the wide range of reasonable professional assistance" and his performance proved effective in removing jurors both he and Monteiro believed to be biased against his defense. *See Strickland*, 466 U.S. at 690. Particularly in light of the Court's thorough and thoughtful examination of the prospective jurors, trial counsel's use of peremptory challenges was well within the "wide latitude" of decisions counsel is afforded and does not amount to constitutional ineffectiveness. *Knight*, 477 F.3d at 16. Further undermining Monteiro's complaint is the jury's mixed verdict acquitting Monteiro on Count 5. ECF No. 282. *See Skilling*, 561 U.S. at 383 (significant that jury convicted defendant on certain counts and acquitted him on others; "[i]t would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that presumption.").

### B. Monteiro Has Not Shown That Trial Counsel's Efforts Were Ineffective Under *Strickland*.

The remainder of Monteiro's 2255 petition includes a series of half-formed claims that trial counsel's performance was deficient throughout his trial and sentencing hearing. None of Monteiro's claims have merit.

Jail Calls and Phone Extraction Reports and Monteiro's Motion to Continue. Monteiro complains that trial counsel did not review over 2,000 jail recordings he received prior to trial and

---

[6] 3/23/2015 Tr. 119:14.

[7] 3/23/2015 Tr. 79:21-81:24 (Mr. Gillespie asked that further inquiry be made of Juror 6 because the juror had difficulty understanding English. Juror 6 was removed for cause.); 3/23/2015 Tr. 91:19-94:7 (Mr. Gillespie argued to the Court that Juror 23's hearing impairment "seemed like a problem." Juror 23 was removed for cause.); 3/23/2015 Tr. 106:16-107:12 (Mr. Gillespie challenged Juror 36 because her daughter was addicted to heroin. Juror 36 was removed for cause.).

argues he should have filed a written motion to continue the trial. ECF No. 433 at 10, 12-13, 17. First, trial counsel did, in fact, file a written motion to continue the trial in order to review these jail calls. ECF No. 252. But Monteiro's claim that trial counsel was less than diligent evaporates upon inspection.

As was noted in its opposition at the time, the government advised trial counsel months before trial that it had obtained jail calls for Vincent Alberico, a drug trafficking associate of Stanley and Joshua Gonsalves (the "Gonsalves Brothers"). ECF 253. The government identified a small number of recorded calls in which Alberico discussed Monteiro's robbery of the Gonsalves Brothers with Stanley Gonsalves and others. *Id.* Before trial, the government filed a motion in limine to admit those calls. ECF 205. In its disclosure, the government advised trial counsel that it was unaware of any other calls that Alberico made that were relevant to Monteiro's robbery but that it would produce all of these calls if requested. ECF 253. Shortly before trial, trial counsel insisted that the government produce all of the Alberico calls in its possession and then used the fact that he had received the 2,000 jail calls he requested as a justification to continue the trial. ECF 252.

At the time, the parties discussed how a wholesale review of these materials was impractical.  3/23/2015 Tr. 9:9-10:11 ("**MR. MORAN:**  If it's just a wholesale review of everything, that is impractical at *any* stage of the litigation.  It's just too many hours for *anyone* to listen to all of this stuff") (emphasis added). The government offered – both at the final pretrial conference and on the first day of the trial – to work with trial counsel to identify any materials he was looking for.  3/11/2015 Tr. 55:2-55:7; 3/23/2015 Tr. 10:4-10:11 ("**MR. MORAN:**  If Mr. Gillespie is looking for something in particular, at the next break, he and I can talk, and if he's looking for it, we'll go back to check our records and we'll do our best to help find whatever he's

9

looking for, if there's something in particular."). The Court ultimately did continue the trial one day to allow counsel additional time to prepare. 3/23/2015 Tr. 127:3-127:6. While the conclusory nature of Monteiro's claim is enough to justify its rejection, see *Jahagirdar v. United States*, 597 F.Supp.2d 198, 202 (D. Mass. 2009), Monteiro offers no reason to suppose that listening to more of jail calls of a drug associate of the Gonsalves Brothers would have helped his case. Indeed, based on the recording played at trial, there was every reason to suspect that embarking on that quest would have produced nothing but additional inculpatory evidence against Monteiro.

Monteiro likewise argues that a closer examination of phone and computer extraction reports might have undermined Guarneri's testimony that Monteiro regularly supplied him with heroin and oxycodone, which the Court credited in making its drug weight finding at his sentencing hearing. ECF No. 433 at 11.[8] But despite the fact that the phone and computer extraction reports were produced five years ago, Monteiro's only argument for prejudice is one he made at sentencing – namely, that a March 13, 2012 text message in which Guarneri told Monteiro he was "still in Miami" and an April 15, 2012 text message in which Guarneri told Monteiro he could reach him at a number with a Miami area code support the conclusion that "Mr. Guarneri was not in Massachusetts for at least 6 weeks…when he claimed to have been picking up heroin in hand to hand buys at Monteiro's residence in Massachusetts." *Id.*

Simply put, the text messages cited by Monteiro do not contradict Guarneri's testimony at trial. Guarneri testified that he regularly went to Florida to purchase oxycodone from doctors – at one point going down for a monthly appointment – and brought the pills back to Massachusetts to

---

[8] The Pre-Sentence Report concluded, and the Court ultimately found, that more than one kilogram of heroin was reasonably attributable to Monteiro, based on Guarneri's testimony that he regularly picked up 50 to 100 grams of heroin from Monteiro throughout 2012; the consensual recordings with Monteiro (which discussed actual sales as well as negotiations for future sales); and seizures of heroin made from Monteiro and Lopes at the conclusion of the case. PSR, ¶ 60.

sell on the street. 3/26/2015 Tr. 80:23-81:1. More importantly, he testified to a general pattern of purchasing heroin from Monteiro that was not consistent in the frequency of the deals or the quantity of the purchase. 3/26/2015 Tr. 111:13-111:25 ("**MR. POHL:** [W]hen you purchased heroin from Mr. Monteiro before February 2013, did it—how often would you purchase heroin from him? **GUARNERI:** It depended on the amounts and how quick I was getting rid of it. It's hard to say exactly, but I would—it was frequent. You know, it could have been on—I could have moved everything in a week or it could have been a couple of weeks, but— **MR. POHL:** When you purchased heroin from Mr. Monteiro, how much did you purchase? **GUARNERI:** Usually 50 or a hundred grams."). Guarneri similarly testified that he had an inconsistent pattern of purchasing other controlled substances, specifically oxycodone, from Monteiro and that Monteiro was not his only source of supply. 3/26/2015 Tr. 79:19-79:34 ("**MR. POHL:** How often were you [purchasing oxycodone from Mr. Monteiro]? **GUARNERI:** I can't say for sure exactly, but when I'd run out, I'd call him. And he wasn't my only source, there were other sources, but it was always just trying to find the best price I could…"). None of the messages cited by Monteiro serve to undercut Guarneri's testimony about his general practice of purchasing heroin and oxycodone from Monteiro, which was generally corroborated by the robbery of the Gonsalves Brothers, the DEA's consensual recordings of Monteiro, and evidence seized from search warrants at the conclusion of the case, among other evidence. The messages do not even say what Monteiro alleges, namely, that Guarneri was out of state for six weeks. Against this backdrop, Monteiro's claims ring hollow. *See United States v. David*, 134 F.3d 470, 478 (1st Cir. 1998) (where "the petitioner offered the district court no names, dates, places, or other details, even though such details presumably were within his ken, . . . the lower court justifiably treated the petitioner's conclusory averments as mere buzznacking"); *Finch v. United States*, No. 18-cr-10006-PBS, 2020

WL 2079301, at *4 (D. Mass. Apr. 30, 2020) (rejecting ineffective assistance claim based on counsel's failure to investigate in part because defendant failed to provide sufficient facts in support of his claim).[9]

Trial Counsel Did Not Prepare His Own Transcripts. In its 21 day disclosure letter, the government advised trial counsel that it intended to introduce several consensually recorded calls in its case in chief and provided trial counsel with draft transcripts of those calls. *See* 3/23/2015 Tr. 18:22-19:3. Monteiro objects to trial counsel's decision not to propose his own transcripts. His petition overlooks the fact that many of his suggested edits were incorporated into the government's transcripts before they were presented to the jury. *See* 3/23/2015 Tr. 20:7-20:8; 3/25/2015 Tr. 11:11-11:14 ("**MR. GILLESPIE**: [B]y the way, we agreed on all of the—my prior objections to the transcripts they had already, filed, so that's not a problem, so we got a bit done."); 12:8-12:16 ("**MR. POHL:** So Mr. Gillespie sent us, around midday yesterday, some suggested corrections to the transcripts that we already had.  We reviewed those with the agents and with Mr. Guarneri, and I think by and large adopted them."). In his petition, Monteiro has not identified any proposed changes that were not adopted and presented that prejudiced him. Moreover, the Court properly instructed the jury before the presentation of the first recording that the recordings—and not the transcripts—were evidence. 3/25/2015 Tr. 81:21-92:10 ("**THE COURT:** [B]ut the transcripts themselves are not evidence…The recording itself and what you hear on the recording is the evidence for you to consider and give what weight, if any, you decide it should have.")  And as the Court also noted, trial counsel was not barred from disputing the accuracy or completeness

---

[9] It is worth noting that the PSR had Monteiro's guideline range for the robbery alone at the statutory maximum of 240 months. PSR, ¶ 59 & 81 (guideline range for robbery plus finding of criminal history category IV led proposed range of 235 to 293 months). Given that, the Court's imposition of a 250 month sentence combining both the drug trafficking and robbery charges was eminently reasonable.

of a recording during cross-examination. 3/23/2015 Tr. 22:1-22:5. Monteiro's claim is meritless. *See David*, 134 F.3d at 478; *Finch*, 2020 WL 2079301, at *4.

<u>Trial Counsel Failed to Object to Preclusion of Gonsalves's Acquittal of 924(c) violation</u>. Monteiro argues that trial counsel's failure to file a written response to the government's motion in limine to preclude the evidence of Gonsalves's acquittal on the 924(c) violation at his trial prejudiced him. ECF No. 433 at 14. Monteiro cannot show prejudice here because the Court's decision to exclude mention of this acquitted conduct was surely correct. ECF 206 and cases cited.

<u>Failure to Subpoena Jail Calls</u>. On the second day of the trial, Monteiro advised trial counsel that there may be recorded jail calls between Guarneri and Michael Fula, a co-conspirator in the Gonsalves Brothers robbery, and that Monteiro thought the calls might be beneficial to his case. 3/25/2015 Tr. 15:9-16:3. Monteiro now argues that trial counsel should have subpoenaed the calls and that his failure to do so prejudiced him from receiving any potential benefit the calls may have had. ECF No. 433 at 14. But trial counsel did not know potential jail calls may have existed until Monteiro mentioned it to him before the second day or trial and could not have reasonably been expected to subpoena potential jail calls he knew nothing about. 3/25/2015 Tr. 15:9-16:3; 16:22-17:13. Even at this late date, Monteiro has made no showing that these *calls even exist*, let alone contain material sufficient to undermine confidence in the outcome of the case. *See Strickland*, 466 U.S. at 694. *See also Janosky v. St. Amand*, 594 F.3d 39, 49 (1st Cir. 2010) ("Where, as here, the result of counsel's alleged failure to investigate is wholly speculative, *Strickland's* prejudice prong is not satisfied."); *United States v. Porter,* 924 F.2d 395, 397 (1st Cir. 1991) (rejecting claim that counsel's failure to interview witnesses constituted ineffective assistance absent any showing as to how that failure deprived the defendant of a viable defense).

Failure to Call or Impeach Witnesses. Trial counsel intended to use the testimony of Wentworth, Monteiro's neighbor, to cast doubt on whether Monteiro robbed the Gonsalves Brothers. 4/1/2015 Tr. 11:10-11:14. Trial counsel proffered that Wentworth would testify that despite seeing police cars on the night of the robbery, "he didn't really notice anything else. And he was in the house and he was moving about and he didn't notice anything." *Id.* That evidence hardly undermines the corroborated evidence of the series of events leading up to, during, and after the robbery, which the First Circuit described as overwhelming. *Monteiro*, 871 F.3d at 112 ("[T]he evidence of Monteiro's guilt [of the robbery] was overwhelming."). Even if Wentworth was ordered to appear at trial, or his statement was somehow admissible through Monteiro's investigator, Monteiro proffered no evidence as to how there is a reasonable probability that this testimony would undermine confidence in the outcome. ECF No. 433 at 14-15.

After Monteiro, Guarneri, and Fula robbed Stanley and Joshua Gonsalves inside Monteiro's home, the Gonsalves Brothers fled in their Mercedes SUV. They eventually turned around and chased some of Monteiro's co-conspirators, who were in a Volvo. The car chase ended in an accident where the Volvo was forced off the road by the Gonsalves Brothers (Guarneri and Fula witnessed the accident from a nearby vehicle). Monteiro argues that trial counsel's failure to have Kenna Marie Johnston, his accident reconstruction expert, present during Guarneri's and Fula's testimony prejudiced him. ECF No. 433 at 15-16. It is difficult to say why having Johnston present during their testimony would have mattered, because she testified that based on her review of the damage to the cars she did not believe they had not collided with each other. 4/1/2015 Tr. 238:2-238:3 ("**MR. GILLESPIE:** I think [Kenna Johnston] laid it out pretty plain as day. That collision, the alleged collision between the Volvo and the Mercedes, could not have happened. It could not have happened."); Def.'s Expert Witness Disclosure, ECF No. 219; Supp. Expert

14

Witness Disclosure, ECF No. 250. Monteiro has again failed to identify how having Johnson present during Guarneri's and Fula's testimony would have enhanced her testimony and cast doubt on the verdict. *See Strickland*, 466 U.S. at 694; *Monteiro*, 871 F.3d at 112.

Monteiro raises a similar complaint with another witness, an insurance adjuster, who he claimed to have subpoenaed. ECF No. 433 at 15. Trial counsel intended to use the witness to introduce photographs of Gonsalves Brothers' Mercedes SUV taken several weeks after the robbery, which he argued show damage consistent with his theory that the damage occurred in an accident prior to the robbery. 4/1/2015 Tr. 18:11-18:16. But the government ultimately stipulated to the introduction of photographs of the vehicle. 4/1/2015 Tr. 19:22-19:24. Even if the Court assumed trial counsel's conduct was unreasonable in failure to secure this witness, Monteiro fails to articulate what this witness had to offer besides the stipulated photographs and why it would have mattered to the outcome of the trial. *See* ECF No. 433 at 15; *Monteiro*, 871 F.3d at 112.

Finally, Monteiro argues that trial counsel failed to effectively cross-examine Special Agent Rideout and Fula. ECF No. 433 at 16-17. Monteiro claims that trial counsel was not effective in his cross-examination of Agent Rideout because trial counsel did not ask about the protocol surrounding activating an informant (presumably Guarneri), but offers no evidence as to why those questions would elicit a response that would undermine confidence in the outcome of the trial. ECF No. 433 at 16-17. Similarly, Monteiro argues that trial counsel was not effective in his cross-examination of Fula – a witness who corroborated Guarneri's testimony about how they robbed the Gonsalves Brothers – because he "failed to impeach Fula on several crucial issues." ECF No. 433 at 18; 3/21/2015 Tr. 46:16-63:15. At no point does Monteiro identify which "crucial issues" trial counsel left untouched. Monteiro fails to identify any aspect of Fula's testimony that defense counsel should have raised on cross-examination, nor does he demonstrate how a different

cross-examination of Fula would have undermined the "overwhelming" evidence of Monteiro's participation in the robbery. ECF No. 433 at 18; *Monteiro*, 871 F.3d at 112. As noted above, this is the kind of speculative claim that falls far short of demonstrating that trial counsel was ineffective or that Monteiro was prejudiced. *Janosky*, 594 F.3d at 49; *Porter,* 924 F.2d at 397.

<u>Failure to Request a Carbone Hearing</u>. On the seventh day of the trial, Monteiro objected to trial counsel's performance ex parte, specifically citing trial counsel's failure to request a "Carbone hearing" with respect to the quality of the consensual recordings involving Monteiro. ECF No. 433 at 16; *United States v. Carbone*, 798 F.2d 21, 25 (1st Cir. 1986). First, trial counsel did in fact ask the Court to continue the jury trial one day to allow for a hearing on the recordings. 3/23/2015 Tr. 18:2-18:15 ("**MR. GILLESPIE:** I mean, [the transcripts] need to be accurate, they need not to be misleading; and although excerpts are allowed, excerpts out of context need to—in that situation, the defendant needs an opportunity, in all fairness, to complete the proper context of the excerpt. So I understand that it would mean one further day of the trial, but I think in light of how important this issue is and in *light of the 1st Circuit's directions that bring it up before the trial starts—and by the way, they suggest that your Honor listen to the tapes yourself, and I would suggest that would be a very good idea in this case*. The tapes are hard to understand. That way, everybody would be ready tomorrow to address the issue thoroughly and with the kind of depth that it really deserves, your Honor.") (emphasis added). And this Court did in fact listen to the recordings and thereafter properly admitted them as evidence. 3/25/2015 Tr. 4:21-4:25; *Carbone*, 798 F.2d at 25. Monteiro has not identified any recordings that in his view were improperly admitted, and as trial counsel was first to concede, and as the First Circuit ultimately held, the

recordings provided overwhelming evidence that Monteiro conspired to distribute heroin. *Monteiro*, 871 F.3d at 109-10.[10]

### C. An Evidentiary Hearing Is Not Necessary Because Monteiro Has Failed To Show It Is Warranted And Because the Court Presided Over The Trial and Sentencing.

An evidentiary hearing is the exception, not the rule, and a petitioner carries a heavy burden in demonstrating a need for a hearing. *McGill*, 11 F.3d at 225. And when a petition for habeas relief is presented to the judge who presided at the petitioner's trial, the judge "is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening a hearing." *McGill*, 11 F.3d at 225. That standard is not heightened when an attorney files an affidavit claiming they were ineffective. *See United States v. Iacaboni*, 2015 WL 1186266, at *7 (D. Mass. March 16, 2015).

In *Iacaboni*, trial counsel submitted an affidavit admitting to deficiencies in his representation in support of his former client's motion for habeas relief under § 2255. *Id.* The court noted that although it does not question the veracity or sincerity of the declaration, it does recognize that, with the benefit of hindsight, attorneys may frequently second guess their performance, and it is for that very reason that a reviewing court eliminate the distorting effects of hindsight and evaluate the circumstances of counsel's challenged conduct from counsel's

---

[10] 3/25/2015 Tr. 27:20-27:22 ("**MR. GILLESPIE:** I'll tell you, frankly, Mr. Monteiro accepts his responsibility for the sale of February 15. How can he deny it?"); 4/1/2015 Tr. 231:7-231:10 ("**MR. GILLESPIE:** Now, I said in my opening in regard to the drug counts in this case that Francisco [Monteiro] was responsible for that sale, for partaking in that sale on February 15th, and certainly the evidence shows that."); 232:8-232:14 ("**MR. GILLESPIE:** So I think you can infer from [the recording of the February 14th call between Guarneri and Monteiro] that this is not the first conversation that the two have had about this prospective deal, it's not the first time that Guarneri has been pestering Monteiro about doing it for him, okay? Again, he does it, but what does he do really? He puts him in touch with somebody who can put him in touch with somebody who apparently is willing to sell him heroin.").

17

perspective at the time. *Id.* The court denied the motion for habeas relief without an evidentiary hearing because (1) the petitioner failed to demonstrate that a hearing was warranted and (2) the court presided over the jury trial and sentencing and found that the record provided a sufficient basis for resolving the motion. *Iacaboni*, 2015 WL 1186266, at *8.

Monteiro does not identify a single issue of fact that needs to be resolved at a hearing, nor does he identify any reason as to why a hearing is necessary. ECF No. 433. Trial counsel's affidavit is filled with general statements about how in hindsight, he "dropped the ball" or "was just not on [his] game." ECF No 433 at 22-23. These general statements about his performance do not raise any issues of fact that would benefit from being resolved at an evidentiary hearing. *Iacaboni*, 2015 WL 1186266, at *7. This Court is intimately familiar with the pre-trial, trial, and sentencing phase of this case – no hearing is necessary. *Id. See also McGill*, 11 F.3d at 225.

### III. CONCLUSION

For the foregoing reasons, the Court should deny Monteiro's motion for new trial based upon ineffective assistance of counsel pursuant to 28 U.S.C. § 2255 without an evidentiary hearing.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:  /s/ Christopher Pohl
Christopher Pohl
Assistant U.S. Attorney

### CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 6, 2020.

/s/ Christopher Pohl
Christopher Pohl
Assistant U.S. Attorney