**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| ) | |
| **v.** ) | |
| ) | **Criminal No. 13-10111-DJC** |
| ) | |
| **FRANCISCO MONTEIRO,** ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                    **June 28, 2022**

### I.      Introduction

Petitioner Francisco Monteiro ("Monteiro" or "Petitioner") has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255 (the "Petition"), alleging ineffective assistance of counsel. D. 433.  The government opposes the Petition.  D. 466.  For the reasons discussed below, the Court DENIES the Petition in part and RESERVES on one ground.

### II.     Standard of Review

An incarcerated person may seek post-conviction relief under § 2255 if his sentence "(1) was imposed in violation of the Constitution; (2) was imposed by a court that lacked jurisdiction; (3) exceeded the statutory maximum; or (4) was otherwise subject to collateral attack." David v. United States, 134 F.3d 470, 474 (1st Cir. 1998).  It is Petitioner's burden to make out a claim for such relief.  Id.

### III.    Factual and Procedural Background

Francisco Monteiro ("Monteiro") was charged with conspiracy to distribute heroin in violation of 21 U.S.C. § 846 (Count I) that ran from in or about March 2012 to March 1, 2013 and

1

involved 100 grams or more of heroin; distribution of heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count II) for a sale to a cooperating witness on February 15, 2013; possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count III) relating to the fruits of a search warrant executed on his residence and the residence of an associate on March 1, 2013; and conspiring to commit a Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count IV) relating to the robbery of two other drug dealers on May 13, 2011; and using and carrying a firearm during and in relation to a crime of violence (namely, the Hobbs Act robbery charged in Count IV) in violation of 18 U.S.C. § 924(c)(1)(A) (Count V). D. 162; D. 361 at 22-23. Without reciting all of the underlying facts proven at trial, see United States v. Monteiro, 871 F.3d 99, 104-06 (1st Cir. 2017), the robbery and firearm charges against Monteiro arose out 2011 robbery committed by Monteiro, co-conspirators (and cooperating witnesses at trial) Joseph Guarneri and Michael Fula, and Tavares Bonnett ("LG") to rob brothers Stanley and Joshua Gonsalves, other Boston-area drug traffickers. Id. The drug charges arose out of Monteiro's own drug distribution business, some of which was supplied to Guarneri. Id. at 105-06. After Guarneri began cooperating with law enforcement agents in 2013, he made a controlled purchase of 96.4 grams of heroin from Monteiro and his associates including Manuel Lopes, on February 15, 2013 and attempted another controlled purchase of heroin on February 25, 2013 in which Monteiro stole the "buy money" from Guarneri, all of which lead to a search warrant executed on Monteiro's residence (and at the residence of Lopes) on March 1, 2013 where agents found the buy money that Guarneri had used for the controlled buys and additional heroin. Id.; D. 361 at 25-27.

After an eight-day trial, a jury convicted Monteiro of the drug and robbery charges (Counts I through IV), but acquitted him of the Count V, the use or carrying of the firearm charge, which would have exposed him to a mandatory, consecutive sentence to any sentence on the other counts

under 18 U.S.C. § 924(c)(1)(A).  D. 282.  Considering the sentencing factors under 18 U.S.C. § 3553(a), including the advisory GSR of 262-327 months, the government's recommendation of a sentence of 327-360 months and Monteiro's recommendation of a 10-12 year sentence, the Court sentenced Monteiro to 250 months in prison on Counts I through III (the drug charges) and a concurrent 240-month sentence on Count IV (the robbery charge).  D. 346; D. 369 at 69-77.  The First Circuit affirmed the conviction on appeal.  D. 402; <u>Monteiro</u>, 871 F.3d at 116.  The U.S. Supreme Court denied certiorari on October 1, 2018, D. 412, making the judgment final.  Monteiro now has filed this timely Petition.  D. 433.

## IV.    Grounds for Relief

Monteiro contends that he is entitled to relief under § 2255 on the grounds that he allegedly received ineffective assistance counsel at trial.  <u>Id.</u> at 2.

## V.    Discussion

### A.    <u>Ineffective Assistance of Counsel</u>

To demonstrate ineffective assistance of counsel, a petitioner must show that: "(1) 'counsel's representation fell below an objective standard of reasonableness' and (2) 'there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.'"  <u>United States v. Constant</u>, 814 F.3d 570, 578 (1st Cir. 2016) (quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694 (1984)).  As to the first <u>Strickland</u> prong, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  <u>Strickland</u>, 466 U.S. at 689; <u>Smullen v. United States</u>, 94 F.3d 20, 23 (1st Cir. 1996). An attorney's performance is deficient "only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it."  <u>Knight v. Spencer</u>, 447 F.3d 6, 15 (1st Cir. 2006) (internal quotation marks omitted).

This Court is mindful of the fact that Monteiro's trial counsel, Raymond Gillespie, has filed an affidavit attesting that he was "ineffective, somewhat unprepared, and not up to [his] full capacity in representing [Monteiro] at trial." D. 433 at 21-23 (Gillespie Aff.). Even deficient representation, however, does not violate the Sixth Amendment if there was no actual prejudice. See United States v. McGill, 11 F.3d 223, 226 (1st Cir. 1993); see United States v. Icaboni, No. 05-10003-NMG, 2015 WL 1186266, at *7 (D. Mass. Mar. 16, 2015) (considering that "trial counsel ha[d] submitted an affidavit readily admitting to various deficiencies in his representation, but concluding that Strickland standard is not satisfied "simply because [a defendant's] attorney willingly admits his own ineffective assistance after vigorously representing [him] at trial with an objectively reasonable strategy that ultimately proves to be unsuccessful"). This is a "highly demanding and heavy burden." Williams v. Taylor, 529 U.S. 362, 394 (2000) (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted). To satisfy the second Strickland prong, a petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland, 466 U.S. at 694. A "reasonable probability is one 'sufficient to undermine confidence in the outcome.'" Johnston v. Mitchell, 871 F.3d 52, 64 (1st Cir. 2017), cert. denied, 138 S. Ct. 1310 (2018) (quoting González-Soberal v. United States, 224 F.3d 273, 278 (1st Cir. 2001)). Although the Court does not agree with Monteiro's contention that counsel's conduct was patently unreasonable, it is on the second prong of Strickland, the prejudice prong, where Monteiro's claims, addressed below (excepting the one on which the Court has reserved), certainly fail. The Court now turns to each of them, grouping them chronologically as they arose during the pretrial and trial phases of the case and/or categorically as some of the grounds overlap.

4

1.      *Alleged Failure to seek Continuance of Trial or Pursue Errors in Transcripts or a <u>Carbone</u> hearing*

Monteiro claims that his counsel was ineffective for failing to file a written motion to continue trial and failing to get a continuance of same to consider discovery allegedly produced by the government on the eve of trial.  Monteiro's counsel, however, did seek a continuance of trial, both orally and in writing, which this Court considered and denied.  At the Final Pretrial Conference (at which Monteiro was present, D. 359 at 3, 48) on March 11, 2015, twelve days before trial, defense counsel moved orally for a continuance of the trial for "at least two weeks." D. 359 at 47.  As basis for same, counsel claimed that he had recently received discovery from the government including 2,000 pages, some of which he claimed was exculpatory evidence, including interview reports and photographs, the results of cell phone searches, that the government should have produced earlier.  D. 359 at 41-47.  The government disputed his characterization of the evidence or that it had failed to make certain evidence available to the defense.  D. 359 at 49, 51-55.  Having heard from both counsel on the issue, the Court declined to continue the trial on the basis of counsel's arguments, particularly where there had been an earlier discovery production and 21-day disclosures by the government and the exculpatory nature of the evidence that the defense had argued was not clear to the Court.  D. 359 at 56-57.  The Court invited defense counsel to "file anything you need to or you think you need to in this case to convince me otherwise," but "counsel should assume that we're going forward as scheduled, and if there's anything else filed, I will obviously consider it promptly."  D. 359 at 57.

Monteiro's attorney indicated that he would follow up with a written motion, D. 359 at 49, as the Court invited him to do, <u>id.</u> at 57, which he then did on March 22, 2015, before trial. D. 252. In this written motion, he reiterated his request for at least a two-week continuance of the trial.  D.

252 at 1.  In it, counsel focused on 2,075 recorded jail calls between Vincent Alberico, Samantha Poitrast (both anticipated government witnesses) and others.  Both Alberico and Poitrast were expected to testify as to statements by Stanley Gonsalves that would inculpate Monteiro in the robbery of the Gonsalves brothers.  D. 252 at 1-2.  Monteiro's counsel contended that these recordings could contain exculpatory evidence or at least inconsistent statements to impeach Alberico and Poitrast.  Id. at 2.  In its opposition, the government pointed out that it had produced the calls of these witnesses concerning the robbery to the defense on October 21, 2014 and had filed a motion in limine to admit same and draft transcripts on February 25, 2015.  On March 18, 2015, the government made defense counsel aware that it had additional jail recordings between Poitras and Alberico, but none that discussed the robbery and none that it intended to introduce, other than those earlier produced.  D. 253 at 1.  It indicated that if trial counsel wanted all of them, the government would produce them.  Id.  Defense counsel made that request on March 19, 2015 and the government produced them.  The government reiterated that this exchange was consistent with its automatic discovery obligations under Fed. R. Crim. P. 16(a)(1)(E).  Id. at 2-3.  On the first day of trial, prior to empanelment, the Court denied the motion, D. 360 at 7, but defense counsel reiterated the basis of his position that all of the recordings were required to be produced under the automatic discovery rules, a contention that the government disputed.  D. 360 at 8-9.

As the record reflects, counsel on Monteiro's behalf, did press the Court for a continuance of trial.  Accordingly, the Court cannot conclude that an alleged failure to do constitutes deficient representation.  Moreover, given the denial of that motion for the reasons that the Court articulated on the record and the lack of argument regarding how the outcome would have been different, this ground also fails on the second prong of Strickland.

The Court notes, however, that it did delay the start of evidence in the trial as Monteiro's counsel suggested when he raised concerns about the accuracy of the transcripts of the conversations between Monteiro and Guarneri.  D. 360 at 16-18, 21.  Monteiro now claims that his trial counsel was deficient for failing to point out errors in the transcripts, prepare his own transcripts or seek a United States v. Carbone, 798 F.2d 21, 24-25 (1st Cir. 1986) (noting that the "preferred way of handling challenges to the accuracy and audibility of tape recordings is at a pretrial hearing") hearing regarding same.  D. 433 at 13-14.  His counsel did so in regard to a Carbone hearing in a motion in limine, D. 230, filed on March 11, 2015, D. 230, in which he moved to exclude the recording a meeting between Guarneri and Monteiro on February 20, 2013.  D. 230 at 2.  He reiterated the request for a Carbone hearing at the Final Pretrial Conference, D. 359 at 37.  On the first day of trial before empanelment, Monteiro's counsel raised the concerns about the accuracy of the transcripts.  The Court agreed to delay opening statements and the start of evidence until March 25, 2015 to give counsel the day to attempt to resolve any issues regarding the transcripts.  D. 360 at 127, 143.  In the interim, Monteiro's counsel filed a motion to exclude certain "inflammatory phrases" from the transcripts under Fed. R. Evid. 403.  D. 258.

On the next day of trial, March 25th, the Court heard counsel on this motion and, based upon those respective arguments, denied the motion.  Monteiro's counsel indicated that the parties had agreed on "all of the – my prior objections to the transcripts [government counsel] had already filed, so that's not a problem."  D. 361 at 11.  Although he indicated that the government had not yet had a chance to sign off on the draft transcripts that he had offered, id., the government clarified that it was able to add some of those excerpts from calls the government was offering into its calls, but to the extent that there were additional calls, counsel could continue to work that out, id. at 12-15.  Moreover, when the government introduced the transcripts at trial, the Court had them marked

only for identification and at the prompting of Monteiro's counsel, D. 361 at 81, gave the jury a contemporaneous instruction that the recordings were the evidence and the "transcripts are only provided to assist you in listening to the recording." D. 361 at 82. With this factual background, the Court does not conclude that counsel's conduct as to this issue was deficient. There has also been no showing of prejudice here under prong two of Strickland, where there is no suggestion, even now, of what portions of the recordings were "altered" or "deleted", D. 433 at 13, to warrant Carbone hearing or how a failure to do more than the advocacy counsel did do on this issue and the related transcript issue would change the outcome of the trial.[1]

> 2. *Jury Selection*

Monteiro alleges that his trial attorney was ineffective during jury selection because he failed to familiarize himself with the rules of jury selection, failed to object to jurors whom Monteiro deemed to be biased or otherwise incapable of serving and failed to allow the Monteiro to be an active participant in his defense. D. 433 at 7–10. The Court notes that it invited defense counsel to discuss with Monteiro whether he sought be present at sidebar during jury voir dire. D. 359 at 39. Counsel confirmed that he did want to be present at sidebar, D. 360 at 5, and Monteiro was present at sidebar throughout voir dire, D. 360 at 68, and as the record indicated, defense counsel consulted with him throughout. See, e.g., D. 360 at 108; D. 360 at 100.

As to specific grounds, Monteiro contends that his counsel allowed jurors 5, 24, 27, 38 and 39 to be seated over Monteiro's objections. Id. at 7.

---

[1] The same is true with the outcome of the sentencing, to the extent that Monteiro also contends that the defense counsel's failure to challenge the recordings and transcripts lead to a two-level enhancement at Monteiro's sentencing for using, threatening or directing violence. D. 433 at 16 n.4. This contention also fails because, in addition to Monteiro's references to violence in the recorded calls to Guarneri, there was other evidence of threats of violence in the course of the robbery of the Gonsalves brothers. See D. 362 at 149-50.

*a. Jurors 5 and 38*

As to Jurors 5 and 38, Monteiro claims in the Petition that his counsel was ineffective for failing to strike them for being incapable of serving. As to Juror 5, Monteiro argues that his counsel should have objected to Juror 5 as she had difficulty hearing due to a head cold. Id. at 7–8. The Court spoke with Juror 5 since she answered the questions about having a disability and the trial schedule posing a hardship. Upon further inquiry by the Court, Juror 5 indicated that she had a "bad head cold" and had difficulty hearing some of the questions. D. 360 at 78. As to hardship, Juror 5 indicated that she had a day business trip scheduled later that week, but indicated that it could be rescheduled. D. 360 at 78. When the Court had the juror step back to hear if there were any further questions from counsel, the Court reiterated that the juror had indicated that she had an upcoming business trip, but it could be rescheduled. D. 360 at 79. The Court also indicated that it thought "the head cold is temporary," but turned to counsel for further inquiry to which counsel for both parties indicated that they had no further inquiry for Juror 5. D. 360 at 79. As to Juror 38, Monteiro claims that Gillespie was deficient by allowing the juror to be seated despite his concerns that the juror had difficulty understanding English. D. 433 at 8–9. Juror 38 answered the question about difficulty understanding English and noted that he understood seventy-five percent of what the Court had said. D. 360 at 107. Although born in Ethiopia, the juror grew up in Eritrea and had been in the United States since 1998. D. 360 at 107-08. As to his schooling and employment, he attended high school "back home," but spent two years in school here and was working in valet parking transportation. D. 360 at 108. When the Court had the juror step back to see if counsel had further inquiry, Monteiro's counsel asked for a minute and, after conferring with Monteiro informed the Court that Juror 38 could serve and "his English is accurate." D. 360 at 108. With agreement from counsel for the government, the Court kept the

juror in the pool. D. 360 at 108-09.  Consistent with his statement to the Court, Monteiro's counsel did not later use a peremptory challenge to strike Juror 38.

As to both Jurors 5 and 38, the conduct of Monteiro's counsel did not fall objectively below a standard of reasonableness.  The record below does not suggest that Juror 5 had a disability preventing her from service where she had no difficulty engaging with the Court at sidebar, nor did it for Juror 38, particularly where he was fluent in answering the Court's direct questions and had spent years studying and working in the United States.  On this record, it was not unreasonable for counsel not to move to strike them for cause or with peremptory challenges where the Court's inquiry as to these jurors did not indicate a successful basis for challenging either for cause and counsel used the peremptory challenges to strike other jurors.  Although trial counsel now regrets not having not done so, D. 433 at 22, this hindsight lament does not satisfy the first prong of Strickland where counsel's conduct falls with the wide realm of reasonable conduct.  Strickland, 466 U.S. at 689 (noting that a court must make "every effort . . . to eliminate the distorting effects of hindsight" and "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance"); Skillman, 941 F. Supp. 2d at 191 (noting that the Court "must examine counsel's performance 'not in hindsight, but based on what the lawyer knew or should have known, at the time his tactical choices were made and implemented'") (quoting United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991)).  Moreover, even assuming that not striking these two jurors was error, there has been no showing that the outcome would have different here and, therefore, the second prong of Strickland has not been satisfied here.

b.  *Jurors 24, 27 and 39*

Monteiro also contends that his trial counsel provided ineffective assistance of counsel since counsel failed to effectuate his desire to eliminate any jurors with law enforcement

connections from the jury and the fact that certain jurors with such connections, namely, Jurors 24, 27 and 39, were seated means that the jury was "either biased, or otherwise incapable of serving." D. 433 at 7-8. As the government notes, there is no *per* se rule barring individuals from sitting on juries when they have some connection with law enforcement. Skilling, 561 U.S. at 386. Instead, the trial court must determine if that connection would affect the potential juror's ability to hear the evidence fairly and impartially and decide the verdict without bias or prejudice to either side. Id. As to jurors 24, 27, 39, to whom Monteiro points as being improperly seated, the Court did so. Juror 24 indicated that her husband was a retired police officer in Ipswich who had served for twenty years and they had friends who were police officers. D. 360 at 94. The Court probed about these connections, reminding the juror that police officers called in the case and asked "whether or not you can be fair and impartial in listening to the testimony of all witnesses including law enforcement officers." D. 360 at 95. The juror responded that "I would think I would hear the other facts in the case and the evidence." D. 360 at 95. The Court questioned her further to ask "the mere fact that someone's a police officer wouldn't make them more credible to you?," to which the juror replied "No." D. 360 at 95. On Monteiro's behalf, his counsel asked for further inquiry given her husband's service as a police officer and knowing a lot of police officers since he expressed concern that jurors "tend to overemphasize their perceived problem or underemphasize, and [he] wonder[ed] if that's what she's doing." D. 360 at 96. The Court declined to inquire further given not just the substance of the juror's responses, but the manner in which she responded to the questions, which "was actually very forthright" and did not suggest that she was "blowing off" the concern or "minimizing" same. D. 360 at 96.

Juror 27 indicated that his best friend from childhood was a Norwood police officer and had been so for approximately five years. D. 360 at 98. When asked what he knew about his

11

friend's work, he said that when they get together, they talk, but noted that "I don't know a lot of details about it."  D. 360 at 98.  The Court asked Juror 27 whether he could "listen to the testimony of any witness and decide its credibility, decide whether or not you find that person credible without any sort of extra credit because they're a law enforcement officer."  D. 360 at 98-99.  When Juror 27 responded "I believe so," the Court pressed him about whether he had "any concerns about [his] ability to do that," to which the juror responded, "[n]ot really, no."  D. 360 at 99.  To probe further, the Court asked him if he would be more inclined to believe a police officer merely because he is a police officer.  D. 360 at 99.  Juror 27 responded that he did not think so and clarified that "I mean, I've never really been put on the spot to hear, but I wouldn't believe so, no." D. 360 at 99.  In response to the Court's solicitation of further questions from counsel, Monteiro's counsel expressed concerns that the juror was still friendly with this friend and that he had "expressed some hesitancy" in his responses."  D. 360 at 99.  After conferring with Monteiro, his counsel asked the Court to inquire further of Juror 27, particularly as to the effect the juror's relationship with a friend in law enforcement could have.  D. 360 at 100.  The Court picked up with Juror 27's answer to the question about whether he would be more inclined to believe a police officer.  D. 360 at 100-01.  Juror 27 clarified:  "I've never been [put] into a position where I have to wonder if a cop would be more honest than another person.  I would imagine if somebody is going to tell the truth, they'd tell the truth.  I wouldn't imagine—well, I guess they could technically have reason to lie, but I tend to believe that most people tell the truth if put to it."  D. 360 at 100-101.  Juror 27 further confirmed that this would apply whether a person was in law enforcement or not.  D. 360 at 101.  Upon further inquiry from the Court, the juror confirmed that he was still "very close" with his friend who was a police officer.  D. 360 at 101.  With that confirmation, the Court further inquired "[w]ould the fact that he's your friend and you're listening

to law enforcement testimony, would that affect your ability to sort of judge for yourself whether or not someone is credible?," to which Juror 27 replied I don't believe so, no."  D. 360 at 101.

Juror 39 indicated that her uncle was a retired chief of police in Keene, New Hampshire and her husband's cousins were worked for the FBI narcotics divisions in New York and/or New Jersey.  D. 360 at 109.  This juror indicated that she did not know much about what these relations did in their jobs, other than "generalizations about how difficult it was working in narcotics in New York City in particular."  D. 360 at 110.  When asked by the Court whether knowing them or what they do would affect her ability to be fair and impartial, Juror 39 replied that "I don't believe so." D. 360 at 110. The Court inquired further to explain that law enforcement officers were expected to testify and that both parties need jurors who can assess witnesses based upon their testimony and whether they are credible regardless of whether they are law enforcement officers.  D. 360 at 110.  Juror 39 responded affirmatively that she could do so.  D. 360 at 110.  Upon the Court's solicitation of further questions from counsel, Monteiro's attorney asked for further inquiry of this juror, particularly as to the cousin who worked for the FBI in narcotics, a federal agent position given that this case would involve testimony from federal law enforcement agents.  D. 360 at 111-12.  Upon such further inquiry, Juror 39 indicated that the cousins had not discussed anything in particular with her about their involvement in drug investigations and only that they did not like traveling into New Yor City without their guns which the juror thought was an overblown concern. D. 360 at 112 (THE COURT:  "And you laugh in the sense that I think you thought that might be too much concern?"  JUROR:  "Yes").

In each of these instances involving Jurors 24, 27 and 39, Monteiro's counsel asked for further inquiry about the jurors' connection to law enforcement.  Based upon the colloquy with the Court and the jurors' respective answers, there was no basis to strike any of the three for cause

13

since their responses did not indicate any bias or prejudice, but instead that they could be fair and impartial in hearing the evidence.  To the extent that Monteiro complains that it was objectively unreasonable for his counsel not to exercise peremptory challenges to remove these three jurors, the Court does not conclude that this choice was "so patently unreasonable that no competent attorney would have made it."  Knight, 447 F. 3d at 15.  First, as to each of these jurors, Gillespie raised concerns about the jurors' connections to law enforcement.  D. 360 at 94–96, 98–100, 109– 12.  The Court, in turn, exercised proper discretion in determining that each juror's connection to law enforcement would not affect their ability to hear the evidence fairly and impartially and decide the case without bias or prejudice for either side.  Id.  Second, in addition to the lack of bias shown by these three jurors, Monteiro's counsel also used all of his peremptories (ten plus one, D. 360 at 118) to strike other jurors (Jurors 4, 12, 17, 9, 10, 18, 22, 3, 26, 29 and 40, D. 360 at 119, 121-23; 125) including one, Juror 3, whom he had moved to excuse for cause given law enforcement connections which the Court had denied. D. 360 at 73-77.  That is, despite counsel's claimed "confusion" about the Court's rules about the exercise of peremptory challenges, D. 433 at 22, counsel pressed concerns about law enforcement connections, moved to challenge some jurors for cause on this basis, see D. 360 at 73-77, 81-85, and exercised all of the peremptories to which Monteiro was entitled including to strike a juror not struck for cause on law enforcement grounds.  Accordingly, this Court does not conclude that counsel's conduct in this respect fell outside of the wide scope of reasonableness.

Even assuming *arguendo* that the failure to strike jurors 24, 27 and 39 was patently unreasonable, Monteiro's claim fails on the second Strickland prejudice prong; i.e., that but for

counsel's failure to strike these jurors, the outcome would have been different.[2]   There is no suggestion here, that but for the sitting of these three jurors (and/or the other two that Monteiro contests) that the outcome at trial would be different.  This is particularly true in a case in which the jury reached a verdict that was at least in part favorable to Monteiro (i.e., his acquittal on Count V, the 924(c) charge).

For all of these reasons, Monteiro's ground for the petition based upon jury selection fails.

---

[2] The Court understands that Monteiro argues that his counsel's failure to strike any juror with law enforcement connections was against his wish to the contrary and, therefore constituted an interference with his participation in his defense and a denial of an impartial jury, D.  433 at 9, structural errors for which he need not show prejudice.  As discussed and implicated above, an impartial jury was seated in this case (one that acquitted Monteiro of one charge as it convicted him of others) and so the Court rejects that basis of his claim.  To the extent that Monteiro argues that he need not show prejudice as to his claimed failure to participate in his defense, relevant law does not support that contention.  In United States v. Cronic, 466 U.S. 648, 658-60 (1984), the Supreme Court noted the rare instances in which prejudice from trial errors might be presumed for ineffective assistance of counsel claims.  Id.; Bell v. Cone, 535 U.S. 685, 695-97 (2002) (discussing Cronic).  These rare instances include the complete denial of counsel; where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; or where "counsel is called upon to render assistance under circumstances where competent counsel very likely could not."  Bell, 535 U.S. at 696 (citing Cronic, 466 U.S. at 659-62).  "[T]he Cronic exception is exceedingly narrow."  United States v. Theodore, 468 F.3d 52, 56 (1st Cir. 2006).  That is, "the circumstances leading to counsel's ineffectiveness [must be] so egregious that the defendant was in effect denied any meaningful assistance at all."  Theodore, 468 F.3d at 56 (citation omitted) (alteration in original).  Accordingly, the First Circuit has been "hesitan[t] to apply Cronic's presumption of prejudice to situations of bad lawyering."  Fusi v. O'Brien, 621 F.3d 1, 7 (1st Cir. 2010) (citing Theodore, 468 F.3d at 56–58) (internal quotation marks omitted); see Scarpa v. DuBois, 38 F.3d 1, 13 (1st Cir. 1994).  The Cronic exception to the showing required under the second prong of Strickland does not apply here.  Nothing about counsel's conduct of jury selection (or otherwise in this case) suggests a complete denial of counsel nor does not it amount to a failure to test the prosecutor's case, a "failure [that] must be complete" or that no counsel could provide effective assistance in the circumstances presented here.  Bell, 535 U.S. at 697.  For all of these reasons, Monteiro must show prejudice under the second prong of Strickland as to all of his grounds and he has failed to do so here as to his claim regarding jury selection.

3. *Failure to prepare for trial and impeachment of key witnesses*

Much of Monteiro's argument about his counsel's deficiencies at trial center around his alleged failure to review the entirety of the government's discovery and failure to impeach key government witnesses effectively.

a. *Preparation for Trial*

Complementing his argument that counsel failed to seek and get a continuance of trial to review the discovery produced by the government (as addressed above), Monteiro contends that his trial counsel was ineffective for failing to review it in preparation for the trial that went forward. Other than specific discovery that Monteiro cites as to text messages of Guarneri and an alleged jail call between Guarneri and Fula (addressed below),[3] he does not identify what evidence that his counsel failed to review or that review would have changed the outcome of the trial.

Monteiro contends that text messages relied upon by his counsel at sentencing (but not proffered at trial) show a basis for undermining Guarneri's trial testimony that Monteiro engaged in drug dealing with him over an extended period of time where the texts show that Guarneri was in Florida for six weeks during this period. D. 433 at 13. These text messages, on March 14, 2012 and April 26, 2012, D. 336 at 7; D. 339-3, however, do not show that Guarneri was out of state for the entire six-week period, just that he was in Florida on at least two occasions during that time. D. 466 at 10-11. That is, the text messages are not inconsistent with Guarneri's testimony at trial and do not contradict evidence that Monteiro sold drugs to Guarneri regularly before the February 2013 controlled purchase (and attempted purchase). D. 362 at 107-08 (Guarneri's testimony that he had been buying drugs including oxycodone, cocaine and heroin from Monteiro

---

[3]It is on this matter, of an alleged jail call between Guarneri and Fula, that the Court reserves any decision as discussed further below and in Section C.

prior to February 2013); D. 363 at 30-31 (after Guarneri switching from selling oxycodone to heroin, he is getting fifty to 100 grams from Monteiro every two weeks or so).   This is consistent with Guarneri's testimony that he made frequent trips between Massachusetts and Florida.  D. 362 at 82; D. 363 at 62-63 (Guarneri testifying, on cross examination, that he made monthly trips to Florida).  Moreover, even assuming *arguendo* that Guarneri did not purchase drugs from Monteiro for six weeks in 2012, the record nevertheless supports the finding that Monteiro was responsible for well over 100 grams of heroin.  See D. 466 at 10 n.8 (citing PSR, ¶ 60); D. 369 at 35, 37, 74 (adopting Probation's calculation of more than one kilogram, but less than three kilograms of heroin as attributable to Monteiro, crediting Guarneri's testimony as to drug sales over time for sentencing, but "not solely on Guarneri's testimony," referencing Monteiro's own recorded statements reflecting his ability to get and supply other drugs).  Thus, Monteiro has not shown prejudice as to counsel's failure to review the text messages prior to the start of trial.

Monteiro further alleges that he received ineffective assistance of counsel based on Gillespie's failure to investigate whether there was additional evidence, namely evidence of a jail call between Guarneri and Michael Fula ("Fula").  D. 433 at 14.  Monteiro's reliance on Ayestas v. Davis, __ U.S. __, 138 S. Ct. 1080 (2018) is inapposite here as to his ineffective assistance claim as the Supreme Court in Ayestas did not conduct Strickland analysis because the question there was whether the Fifth Circuit applied the wrong legal standard in evaluating a request for funding for investigative services under related to a 28 U.S.C. § 2254 habeas petition.  See Ayestas, 138 S. Ct. at 1085.  Putting that aside, it is not clear that the alleged failure to uncover an alleged phone call between Guarneri and Fula constituted deficient representation where the substance of same has not been developed so that the Court can decide of whether it satisfies Strickland and, therefore, the Court reserves on this issue.  See Section C.

Finally, Monteiro's claims for ineffective assistance of counsel as to his counsel's cross-examination of two government witnesses, DEA Special Agent Carl Rideout ("Rideout") and Fula, a cooperating witness who also participated in the robbery of the Gonsalves brothers with Monteiro. D. 433 at 16–18.  As to Rideout, Monteiro argues that counsel was ineffective because he failed to question the witness about the agency process to activate an informant.  Id. at 16–17.  In this regard, Monteiro points to Gillespie's admission that he "wasn't thoroughly prepared" to cross examine Rideout.  Id. at 17 n.5 (quoting id. at 23, ¶ 14).  The transcript of defense counsel's cross examination of Rideout shows otherwise. D. 362 at 28-64.   During such questioning, trial counsel brought out that Guarneri had cooperated twice with law enforcement and that he had agreed to cooperate because he was going to be facing an oxycodone distribution charge.  D. 362 at 28-29.  He brought out that Guarneri had pled guilty, but had not yet been sentenced at the time of his testimony.  Id. at 30.  He further elicited that the DEA had a process for establishing an informant and Guarneri had an agreement with the DEA which obligated him not to commit other crimes and not to engage in conversations (with the target, Monteiro), other than those with the authorization of DEA.  D. 362 at 32.  That coupled with later admissions that counsel elicited from Guarneri's cross examination (i.e., that he was not authorized to engage in criminal activity other than that authorized by DEA and that he had been in contact with Monteiro for some time before he entered into his agreement regarding only DEA-authorized contact), D. 363 at 41-43, allowed counsel to argue to the jury that Guarneri was not credible since he was facing a lengthy sentence for his own drug dealing, that he testified to get a "huge break" on his sentence and as he had done with his prior cooperation, "[h]e's the kind of guy who will basically say anything to accomplish that," D. 366 at 233.  He made such arguments not just as to Guarneri's testimony as to the 2011 robbery, but his testimony that he had been getting drugs regularly from Monteiro prior to February

18

2013.  D. 366 at 234.  At to the latter, although Monteiro agreed that he had conducted the February

15, 2013 heroin deal, his counsel urged the jury to reject Guarneri's testimony that he had regularly

received drugs from Monteiro prior to that because they could reasonably infer from the testimony

that the two had prior conversations to the recorded ones and "Guarneri ha[d] been pestering

Monteiro" about supplying with him with drugs and even the February 15, 2013 recordings suggest

that Monteiro was just putting Guarneri in touch with a supplier.  Defense counsel's effective cross

examination of the DEA special agent, Rideout, and Guarneri laid the foundation for doing so and

did not constitute deficient representation.

The Court now turns to Monteiro's similar argument and defense counsel's own view that he

"completely dropped the ball" as to his cross examination of Fula, the other cooperating witness

and participant in the robbery of the Gonsalves brothers.  D. 433 at 23, ¶ 15.  The Court recalls

that the day after his cross examination of Fula, defense counsel sought to introduce the defense

expert disclosure of Kenna Johnston to suggest that Fula had changed his trial testimony (from his

testimony at the prior Gonsalves trial) about whether the Mercedes (of Gonsalves' brothers) had

struck the middle or back of the Volvo (in which others from Monteiro's house were driving) after

the robbery.  D. 366 at 22-24.  In denying the admission, the Court pointed out then (and does so

again now) that defense counsel cross examined Fula on alleged inconsistencies in his statements

on this topic and others.  D. 366 at 25.[4]    Later that same day, defense counsel introduced the

expert testimony of Johnston, the defendant's accident reconstructionist, who opined that the

damage to the Volvo was not consistent with a collision or the paint missing from the Mercedes,

and there was nothing about the damage to the Mercedes that was consistent with the damage to

---

[4] It was on the heels of this exchange that Monteiro asked to be heard *ex parte* at sidebar.  D. 366
at 26-27; D. 384, and the Court made the same point to him directly in the presence of his counsel,
D. 384 at 4.

the Volvo.  D. 366 at 182-89.  In closing, defense counsel relied upon this opinion and the

inconsistencies in Fula's testimony regarding same (noting that Fula "[e]arly . . . said hit the car in

the back end, in the back end, and it spun out and flipped" but "[t]oday or yesterday all of a sudden,

no, it was up more near the center of the vehicle. . . . No, no, too inconsistent") to argue to the jury

that the alleged collision between the Volvo and Mercedes, as Fula testified, had not happened.

D. 466 at 238.  Given his cross examination of Fula on this point, D. 365 at 83-88, the contrary

opinion from Johnston,[5] the Court does not conclude that either the examination of Fula was

deficient on this point.

Significantly, even if any of the examination was deficient, that the outcome of the trial

would have been different but for such deficiency as required under the second prong of Strickland,

particularly in light of the entirety of the evidence before the jury (including Johnston's opinion

and the testimony of Joshua Gonsalves[6]) has not been satisfied here.  From opening through

_____

[5] Monteiro also contends that Gillespie was ineffective because he did not ensure that Johnston was present for some of the testimony presented by government regarding the car accident. D. 433 at 15–16 & n.3. Even if Monteiro had satisfied the first Strickland prong with respect to the expert, the claim nevertheless fails because Monteiro has not shown how he was prejudiced by the alleged deficiency. Although counsel ensured that Johnston was present for the bulk of Josh Gonsalves's testimony,  Monteiro claims that because the expert was not present for the testimony of government witnesses of Guarneri, Fula and Trooper Joshua Fries, who observed the substantial damage to the Volvo on the evening of May 13, 2011, D. 364 at 115-16, the government was able to suggest that her expert opinion was not well founded. Id. at 16 (citing D. 366 at 198).  In his closing, however, Gillespie stated that "[Johnston] laid it out pretty plain as day . . . . [T]he alleged collision between the Volvo and the Mercedes, could not have happened . . . . In spite of the worthy cross-examination by [the government], really that didn't disturb the certitude with which [Johnston] gave her opinion." D. 366 at 238. That is, the jury heard, and could rely upon, the defense expert's opinion, contrary to that of the government's witnesses, that the accident did not occur.

[6]Joshua Gonsalves, one of the victims of the May 13, 2011 serving his own federal, twenty-year sentence for drug trafficking conspiracy and money laundering, was yet another witness called by defense.  He testified that his vehicle, the Mercedes, had been damaged on May 10, 2011, not on the heels of the robbery, a robbery that he attested had never happened. D. 366 at 82, 98-99, 101, 152 ("I was never robbed"); Monteiro, 871 F.3d at 112.

closing, Monteiro's theory of defense was that although he had sold heroin to Guarneri on February 15, 2013 after being "pestered by Guarneri" to do so, that he was not involved in any greater drug trafficking conspiracy, that it was not credible that he had regularly supplied drugs to Guarneri and that the robbery of the Gonsalves brothers on May 13, 2011 had never happened. D. 361 at 37-40; D. 366 at 233-40. Given the surveillance and recording by DEA of the February 15, 2013 transaction, this was a reasonable strategy as was striking at the credibility of the Guarneri and Fula, both cooperating witnesses who were the only percipient witnesses to the robbery who testified at trial. As the government pointed out in its closing and rebuttal, Guarneri's and Fula's respective testimony of the robbery was consistent in material respects:  in regard to Monteiro's role in planning the robbery; the execution of it by Monteiro, Guarneri, Fula and LG; LG striking Stanley Gonsalves on the head; and the four participants fleeing to Monteiro's grandmother's residence where they split the proceeds. D. 366 at 228, 241. Moreover, aspects of the robbery were corroborated from other sources:  Karen Swift, who testified that Stanley Gonsalves showed up at her residence on the night of the robbery with a gash on his head (consistent with Guarneri and Fula's testimony that LG struck him); the Alberico call with Stanley Gonsalves in which he discussed the robbery; and Stanley Gonsalves' internet searches soon after the robbery, including of Francisco Monteiro, to confirm the identities of the robbers. D. 366 at 228-29; D. 365 at 121, 136-37; D. 363 at 102-08; D. 363 at 121-30.

Even though there was "overwhelming" evidence of Monteiro's guilt as to the drug and robbery charges, Monteiro, 871 F.3d at 112, the jury acquitted Monteiro of the use of a firearm in connection with the robbery charge. D. 368 at 5-6. It was the conflict between Guarneri's testimony (that both LG and Fula had guns during robbery) and Fula's testimony (that only LG had a gun) that defense counsel brought out in cross examination and closing argument, D. 366 at

238; D. 365 at 67, and may have led to the jury's acquittal of Monteiro on the one firearm charge against him.[7]  This fact suggests the reasonableness of the defense strategy, but also the lack of showing of a "reasonable probability" that the outcome would have been different, but for counsel's alleged errors.  See Porter, 558 U.S. at 41.

For the forgoing reasons, Monteiro's claim for ineffective assistance of counsel as to these aspects of the trial fails.

### 4.    Defense witnesses

As part of its affirmative defense case, Monteiro's counsel called a probation officer who managed the electronic monitoring that Monteiro was subject to at the time of the May 13, 2011 robbery, D. 365 at 152-54; a private investigator to lay part of the foundation for photographs that he would later admit, D. 366 at 31; Jocelyn Truell, Monteiro's girlfriend, D. 366 at 42;  along with Josh Gonsalves and Johnston, the accident reconstructionist, as discussed above; D. 366 at 81; D. 366 at 154.  Monteiro, however, faults his counsel for failing to secure bench warrants for two defense witnesses who did not appear.

First, Monteiro argues that Gillespie was ineffective for failing to seek a bench warrant for Monteiro's neighbor, Richard Wentworth, who did not appear at trial, despite being subpoenaed.

---

[7] On a related note, Monteiro points to his counsel's failure to oppose the government's motion in limine to exclude introduction of the Gonsalves brothers' acquittal on the Section 924(c) in furtherance of a drug trafficking conspiracy (which included the firearm allegedly stolen from them during the May 13, 2011 robbery) in their case.  D. 206 at 2-3.  The government sought the exclusion of same on relevancy and Fed. R. Evid. 403 grounds.  D. 206 at 4-5.  Even now, Monteiro does not articulate the relevance of this matter, how any probative value of same was not substantially outweighed by undue prejudice or confusion for the jury or counters the law cited by the government that a defendant ordinarily may not introduce even his own prior acquittal in a prior proceeding involving similar subject matter into evidence.  D. 206 at 5 and cases cited.  Against this backdrop, the Court fails to see how it was unreasonable for trial counsel not to pursue opposition that would have been futile.

D. 433 at 15.  Defense intended to elicit from Wentworth's testimony that he saw only police car lights, D. 366 at 11, presumably on the night of the robbery.  Monteiro, however, does not offer any support to show how Gillespie's failure to seek a bench warrant or otherwise admit the substance of his testimony was unreasonable.[8]  Nor does Monteiro suggest how Wentworth's testimony would have changed the outcome of the trial.

Similarly, Monteiro's claim that Gillespie's failure to seek a bench warrant for an insurance adjuster, Mr. McLean, constituted ineffective assistance of counsel, D. 433 at 15, also fails.  As with Wentworth, Monteiro has not stated how his counsel was ineffective for failing to seek a bench warrant for him.  Monteiro has also failed to show how the intended testimony, which included verifying records and authenticating photographs of the vehicle involved in the robbery, D. 366 at 14, would have led to a different outcome at trial.  Importantly, the government stipulated to the introduction of the photographs, id. at 19–20, which Gillespie stated was his main reason for calling the insurance adjuster to testify, id. at 14 (explaining that he "principally wanted him to verify the record, but even more so to authenticate the photographs of the Mercedes").  That is, even assuming that it was unreasonable for counsel not to seek bench warrants for witnesses who failed to appear for trial, there is no showing that there was prejudice to Monteiro as required by the second prong of Strickland.

---

[8] In course of his contention about his counsel's alleged deficiency in this regard, Monteiro suggests that his attorney was hampered by his unfamiliarity with the rules of evidence.  The Court, having presided over the trial, is puzzled by this contention.  Trial counsel's familiarity with the rules of evidence was evident throughout the trial including the many objections that trial counsel made that the Court sustained, see, e.g., D. 361 at 83-84, 120, 129; D. 362 at 8, 9, 12-13, 38, 79, 102, 108, 111, 134-35, 144; D. 363 at 9, 16, 125-26, 128; D. 365 at 55, and the scope of the motions (and opposition to the government's motions, including, for one example, to exclude Monteiro's accident reconstruction expert that the Court denied, D. 232; D. 365 at 168; D. 366 at 148) and arguments that counsel pressed on Monteiro's behalf, both before and during the trial.  That these objections and motions were not all successful does not meet the stringent standard under Strickland.

5.    *Considering the cumulative effect of counsel's representation*

Having parsed each of the grounds of the Petition addressed above, the Court also does not conclude that the cumulative effect of trial counsel's alleged deficiencies satisfy <u>Strickland</u>, putting aside the ground upon which the Court expressly reserves for the moment.

To the extent that Monteiro that any or all of his counsel's alleged errors rise to the level where it would be appropriate for the Court to apply <u>Cronic</u>, thereby presuming prejudice, this Court disagrees.  <u>See Bell</u>, 535 U.S. at 697–98 (2002) (declining to apply Cronic where respondent did not argue his counsel was deficient throughout the entire sentencing proceeding, but rather only at "specific points").   Because trial counsel "cross-examined witnesses, made objections, and presented a closing argument," <u>Cronic</u> does not apply.  <u>See Theodore</u>, 468 F.3d at 56–58 (citation omitted).

**B.    <u>An Evidentiary Hearing is Not Warranted as to the Claims Resolved Here</u>**

An evidentiary hearing is appropriate "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255.  "Even if a[n evidentiary] hearing is requested, a district court properly may forgo it when (1) the motion is inadequate on its face, or (2) the movant's allegations, even if true, do not entitle him to relief, or (3) the movant's allegations "need not be accepted as true because they state conclusions instead of facts, contradict the record, or are 'inherently incredible.'"  <u>David v. United States.</u>, 134 F.3d 470, 477 (1st Cir. 1998) (quotation omitted).

Having presided over the trial, having reviewed the entirety of the final pretrial conference, trial and sentencing transcripts and having considered the parties' filings including the Gillespie's affidavit, the Court concludes that an evidentiary hearing is not warranted.  As to each of the alleged errors alleged by Monteiro and supported by his trial counsel's affidavit, the Court does

not conclude that they were patently unreasonable after a careful review of the record.  More significantly (and as the basis for the denial of an evidentiary hearing), even assuming that these errors were deficient under the first prong of <u>Strickland,</u> for all of the reasons detailed above, there is no showing of prejudice under the second prong of <u>Strickland,</u> i.e., that the outcome of the trial would have been different but for these errors.  Accordingly, to the extent that Monteiro seeks an evidentiary hearing on any of the grounds in the Petition resolved in this decision, such hearing is not warranted.  <u>Moreno-Morales v. United States</u>, 334 F.3d 140, 145 (1st Cir. 1998) (noting that "[e]vidary hearings on § 2255 petitions are the exception, not the norm, and there is a heavy burden on the petitioner to demonstrate that an evidentiary hearing is warranted").

### C.    Given the Withdrawal of Monteiro's 2255 counsel and the Reservation of the Court on the other "jail calls" that Monteiro cites, the Court Appoints Counsel and Grants Leave for Further Filing as this Issue

Given the unique posture of Monteiro's representation in this case, the Court makes one final note.  After Monteiro's present counsel filed the Petition, D. 433, and the government filed its opposition to same, D. 466, this counsel moved to withdraw, citing a "breakdown in communication" with his client.  D. 469; <u>see</u> D. 468.  Thereafter, Monteiro has sought the appointment of counsel.  D. 471.  As grounds for same, Monteiro, in several filings, has insisted that he needs counsel to obtain and review the "cellphone extractions" and to prove that "there was no conspiracy" and to impeach Guarneri; to prepare accurate transcripts to impeach Rideout and Guarneri regarding the recorded conversations, and reply to the government's opposition, D. 471; D. 475, and to get other "jail calls" (that he notes are not the Alberico-Stanley Gonsalves call admitted at trial) that would exculpate Monteiro from drug conspiracy charge.  D. 482 at 1-2.

To the extent that Monteiro's *pro se* filing re-tread the same ground as the Court has addressed (i.e., challenge to the accuracy of the transcripts of the recorded conversations between

Monteiro and Guarneri; cellphone extractions regarding Guarneri's trips to Florida that counsel relied upon at sentencing, but not at trial; or the other grounds fleshed out in the Petition and addressed by the Court above), the Court denies leave to Monteiro to make further filing.  To the extent that Monteiro's *pro se* filings reiterate the claim in the Petition that there were jail call(s) between Guarneri and Fula that would exculpate Monteiro, D. 361 at 15-16; D. 433 at 14; D. 482 at 1-2, the Court does not think that the record is sufficiently developed on this issue for the Court to resolve the matter even as the government points out that there has not been sufficient development by Monteiro that such calls even exist. D. 466 at 13.  Although it remains to be seen that even if they do, whether defense counsel's alleged failure to investigate them would satisfy both prongs of <u>Strickland</u>, the Court will give Monteiro leave to address this issue in a supplemental filing and shall appoint counsel (as Monteiro qualified for appointed counsel before, D. 110, 136).  Once counsel is appointed, the Court shall set scheduling for such supplemental filing.

**VI.   Conclusion**

For the foregoing reasons, the Court DENIES Monteiro's Petition under 28 U.S.C. § 2255, D. 433, on the grounds addressed above and RESERVES on the issue of Guarneri-Fula jail calls. The Court ALLOWS Attorney Camera's motion to withdraw, D. 469, and ALLOWS Monteiro's motion for appointment of counsel, D. 471.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge